UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DYLAN B. DAVIS, individually and as independent administrator of, and on behalf of, the ESTATE OF JAMES DEAN DAVIS and JAMES DEAN DAVIS'S heir-at-law, and on behalf of PEGGY HEBERT | § § § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 5:19-cv-00746 |
| LA SALLE COUNTY, TEXAS; BEATRICE MARIE HERNANDEZ; YVETTE MARIE MARTINEZ; FRANCISCA G. GARZA a/k/a FRANCES GARZA; ANA MARIA OLIVAREZ a/k/a ANNA MARIA OLIVAREZ; SARAH ELIZABETH MURRAY; and DOROTHY MARIE RAMIREZ, | § § § § § § § § § | JURY DEMANDED |
| Defendants. | § | |

## <u>PLAINTIFF'S ORIGINAL COMPLAINT</u>

> **This is a case of a tragic denial of medical care desperately needed by James Dean Davis, a pre-trial detainee. Jailers ignored Mr. Davis's pleas for help, and his crying out that he was going to die. Defendants' deliberate indifference and objective unreasonableness caused Mr. Davis's unnecessary death.**



Table of Contents

I.   Introductory Allegations ................................................................. 4

    A.   Parties .................................................................................. 4

    B.   Jurisdiction and Venue ......................................................... 7

II.  Factual Allegations ...................................................................... 8

    A.   Introduction ......................................................................... 8

    B.   James Dean Davis ................................................................ 8

    C.   Mr. Davis's Incarceration and Death in the La Salle County Jail ........ 9

        1.   Booking and Intake ....................................................... 9

        2.   Mr. Davis's Horrific Suffering and Unnecessary Death.......... 15

            a.   Texas Rangers Report ................................................. 15

            b.   Witness Statements ..................................................... 33

                (1)   Marie Aguilar – Jailer ......................................... 33

                (2)   Ransley Dontrell Bailey – Prisoner........................ 34

                (3)   Antonio Garcia – Acquaintance of Mr. Davis ......... 35

                (4)   Francis Garza – Jailer (2 Interviews) ................... 36

                (5)   Beatrice Hernandez – Jailer (2 interviews)............ 38

                (6)   Denise Jimenez – Dispatcher/Jailer ..................... 43

                (7)   Joshua Reyes Martinez – Jailer............................ 44

                (8)   Yvette Martinez – Sergeant/Jailer (3 Interviews) ........ 45

                (9)   Sarah Elizabeth Murray – Dispatcher/Jailer ......... 50

                (10)  Anna Marie Olivarez – Jailer.............................. 51

                (11)  Augustine Nathanial Ortiz – Prisoner .................. 52

                (12)  Dorothy "Dottie" Ramirez – Jail Administrator ......... 53

                (13)  Jared Ross Ramirez – Prisoner ........................... 56

            c.   La Salle County Jail Records ....................................... 57

3.    Violation of La Salle County Written Policies ........................................ 60

D.    Post-Death Reports ................................................................................ 62

1.    Death Certificate and Autopsy ................................................. 62

2.    La Salle County ....................................................................... 62

E.    Knowledge and Education ...................................................................... 65

1.    Defendants Knew That Jail Intoxication Deaths Are a Widespread Problem ...................................................................... 65

2.    Defendants' Training and Education ........................................ 67

F.    Texas Commission on Jail Standards ................................................... 74

1.    Notice of Non-Compliance and Technical Assistance to La Salle County ....................................................................... 74

2.    La Salle County Cited for Other Violations Occurring in its Jail............. 82

G.    *Monell* Liability of La Salle County .................................................... 85

III.    Causes of Action .................................................................................................. 88

A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ........................................ 88

B.    Cause of Action Against All Natural Person Defendants (Beatrice Marie Hernandez, Yvette Marie Martinez, Francisca G. Garza a/k/a Frances Garza, Ana Maria Olivarez a/k/a Anna Maria Olivarez, Sarah Elizabeth Murray, and Dorothy Marie Ramirez) Under 42 U.S.C. § 1983 for Violation of Mr. Davis's 14th Amendment Due Process Rights to Reasonable Medical Care, to be Protected, and not to be Punished........................................ 91

C.    Cause of Action Against La Salle County Under 42 U.S.C. § 1983 for Violation of Mr. Davis's 14th Amendment Due Process Rights to Reasonable Medical Care, to be Protected, and not to be Punished ................... 95

D.    Causes of Action Against La Salle County for Violation of Americans with Disabilities Act and Rehabilitation Act ............................................... 98

IV.    Concluding Allegations and Prayer ................................................................... 100

A.    Conditions Precedent ........................................................................... 100

B.    Use of Documents at Trial or Pretrial Proceedings ........................... 100

C.    Jury Demand ....................................................................................... 100

D.    Prayer .................................................................................................. 100

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.     Introductory Allegations

A.     Parties

1.     Plaintiff Dylan B. Davis ("Dylan Davis") is a natural person who resides and did reside, and was domiciled, in Texas at all relevant times.  Dylan Davis was James Dean Davis's son.  James Dean Davis is referred to herein at times as "Mr. Davis."  Dylan Davis sues in his individual capacity and as the Independent Administrator of the Estate of James Dean Davis, Deceased.  Dylan Davis, when asserting claims in this lawsuit as the Independent Administrator, does so in that capacity and on behalf of the estate (including Mr. Davis's heir at law, Dylan Davis), and on behalf of Peggy Hebert to assert her individual claims for wrongful death damages.  Peggy Hebert was the legal and biological mother of James Dean Davis.  Letters of independent administration were issued to Dylan Davis on or about March 29, 2019, in Cause Number 1606, in the County Court of La Salle County, Texas, in a case styled *Estate of James Dean Davis, Deceased*.

2.     Defendant La Salle County, Texas ("La Salle County") is a Texas county.  La Salle County may be served with process pursuant to Federal Rule of Civil Procedure 4(j)(2) by serving its chief executive officer, Honorable County Judge Joel Rodriguez, Jr., at 101 Courthouse Square #315, Cotulla, Texas  78014, or wherever Honorable Judge Rodriguez may be found.  Service on such person is also consistent with the manner prescribed by Texas law for serving a summons or like process on a county as a Defendant, as set forth in Texas Civil Practice and Remedies Code Section 17.024(a).  La Salle County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief policymakers, all of whom acted under

color of State law at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act).  La Salle County's policies, practices, and/or customs were moving forces behind constitutional violations, and resulting damages and death, referenced and asserted in this pleading.

3.     Defendant Beatrice Marie Hernandez ("Ms. Hernandez or "Jailer Hernandez") is a natural person who resides, is domiciled, and may be served with process at 603 Johnston, Cotulla, Texas  78014.  Ms. Hernandez may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Hernandez at Ms. Hernandez's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Hernandez is being sued in her individual capacity, and she acted at all relevant times under color of State law.  Ms. Hernandez was employed by La Salle County at all such times and acted or failed to act in the course and scope of her duties for La Salle County.

4.     Defendant Yvette Marie Martinez ("Ms. Martinez" or "Sergeant Martinez") is a natural person who resides, is domiciled, and may be served with process at 400 Goft, Cotulla, Texas  78014.  Ms. Martinez may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Martinez at Ms. Martinez's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Martinez is being sued in her individual capacity, and she acted at all relevant times under color of State law.  Ms. Martinez was employed by La Salle County at all such times and acted or failed to act in the course and scope of her duties for La Salle County.

5.      Defendant Francisca G. Garza a/k/a Frances Garza ("Ms. Garza" or "Jailer Garza") is a natural person who resides, is domiciled, and may be served with process at 1503 Chaparral Street, 1402 Chaparral Street, or 1402 County Road 2005 in Pearsall, Texas 78061.  Ms. Garza may also be served with process at her place of employment which is, upon information and belief, Medina County Sheriff's Office, 801 Ave Y, Hondo, Texas 78861.  Ms. Garza may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Garza at Ms. Garza's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Garza is being sued in her individual capacity, and she acted at all relevant times under color of State law. Ms. Garza was employed by La Salle County at all such times and acted or failed to act in the course and scope of her duties for La Salle County.

6.      Defendant Ana Maria Olivarez a/k/a Anna Maria Olivarez ("Ms. Olivarez" or "Jailer Olivarez") is a natural person who resides, is domiciled, and may be served with process at 501 Miller Lane #469, Cotulla, Texas 78014.  Ms. Olivarez may also be served with process at her place of employment, La Salle County Sheriff's Office, 703 N. Main, Cotulla, Texas  78014.  Ms. Olivarez may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Olivarez at Ms. Olivarez's dwelling or usual place of abode with someone of suitable age and discretion who resides there.  Ms. Olivarez is being sued in her individual capacity, and she acted at all relevant times under color of State law.  Ms. Olivarez was employed by La Salle County at all such times and acted or failed to act in the course and scope of her duties for La Salle County.

7.      Defendant Sarah Elizabeth Murray ("Ms. Murray" or "Dispatcher/Jailer Murray") is a natural person who resides, is domiciled, and may be served with process at 1212 Live Oak B, Cotulla, Texas  78014.  Ms. Murray may also be served with process at her place of employment,

La Salle County Sheriff's Office, 703 N. Main, Cotulla, Texas 78014. Ms. Murray may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Murray at Ms. Murray's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Ms. Murray is being sued in her individual capacity, and she acted at all relevant times under color of State law. Ms. Murray was employed by La Salle County at all such times and acted or failed to act in the course and scope of her duties for La Salle County.

8.      Defendant Dorothy Marie Ramirez ("Ms. Ramirez," "Jail Administrator Ramirez," or Administrator Ramirez") is a natural person who resides, is domiciled, and may be served with process at 607 Jay, Cotulla, Texas 78014. Ms. Ramirez may also be served with process wherever she may be found or, pursuant to Federal Rule of Civil Procedure 4(e), by leaving a copy of this complaint and a summons directed to Ms. Ramirez at Ms. Ramirez's dwelling or usual place of abode with someone of suitable age and discretion who resides there. Ms. Ramirez is being sued in her individual capacity, and she acted at all relevant times under color of State law. Ms. Ramirez was employed by La Salle County at all such times and acted or failed to act in the course and scope of her duties for La Salle County.

B.      Jurisdiction and Venue

9.      The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to federal statutes providing for the protection of civil rights. This suit arises under the United States Constitution and federal statutes including but not necessarily limited to 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act.

10.     The court has personal jurisdiction over La Salle County because it is a Texas county.  The court has personal jurisdiction over the natural person Defendants because they reside and are domiciled in, and are citizen of, Texas.

11.     Venue is proper in the San Antonio Division of the United States District Court for the Western District of Texas, pursuant to 28 U.S.C. § 1391(b)(1).  All Defendants are residents of Texas, and Ms. Garza is a resident of the Western District of Texas, San Antonio Division.  La Salle County is a Texas county, and all natural person Defendants are Texas residents, domiciled in Texas, and citizens of Texas.

II.     Factual Allegations

    A.     Introduction

12.     Plaintiff provides in the factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  Rather, Plaintiff intends that those sections provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claim(s) have facial plausibility.  Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

    B.     James Dean Davis

13.     Mr. Davis was born in 1975 in Houston, Texas, and he attended school in Channelview.  He lived in Cotulla, Texas and was only 42 years old when he died.

C.     Mr. Davis's Incarceration and Death in the La Salle County Jail

       1.     Booking and Intake

14.     It is undisputed that, at the time Mr. Davis died, he had not been booked-in.  This is inexcusable and, more importantly, a clear violation of jail standards.  The violation is particularly egregious when considered with the lengthy time between when book-in should have occurred and Mr. Davis's death.  Booking-in a prisoner is important to determine the prisoner's significant physical, medical, and/or mental health issues.  If Mr. Davis had been booked-in as required, and then received medical treatment away from the jail, he would not have died.

15.     Mr. Davis arrived in the booking area of the La Salle County jail, according to La Salle County records, at approximately 2:20 p.m. on July 31, 2017.  Mr. Davis was booked in for a non-violent alleged offense: theft over $100.00 but under $750.00.  Therefore, and based upon prior experience with Mr. Davis, none of the Defendants, or any other jailer or personnel at the La Salle County jail, were concerned and/or had any reason to be concerned about Mr. Davis being violent or exhibiting assaultive behavior.  They had no fear that, if they were to transfer him to an emergency room at a local hospital, he would attempt to escape and/or harm anyone.  Upon information and belief, they had never seen Mr. Davis engage in conduct, during prior incarcerations at the jail, which would indicate that he was a flight risk and/or would harm anyone if he were taken to an area hospital for needed emergency medical treatment.

16.     Jailer Hernandez was the booking officer on duty when Mr. Davis arrived at the La Salle County jail on July 31, 2017.  Sergeant Martinez was also working at the jail and, upon information and belief, searched Mr. Davis at or near the time he arrived at the jail.  Ms. Hernandez and Sergeant Martinez were employed by La Salle County, as were all other natural person Defendants during all time periods relevant to claims in this case.  Upon information and belief, the jail was located at 703 North Main Street, Cotulla, Texas  78014.  Mr. Davis was not cursing,

aggressive, or resisting.  Jailer Hernandez signed a detention report reflecting this and other information regarding Mr. Davis's July 31, 2017 pre-trial detention.  Ms. Hernandez also signed a La Salle County Jail Search form indicating that no unclothed search of Mr. Davis was conducted. This was further evidence that Ms. Hernandez did not have any concern about Mr. Davis hiding weapons and/or any anything else which could be used to harm someone at the jail, or to harm anyone who would transport him to a local hospital for needed emergency medical treatment. Another document signed by Ms. Hernandez explicitly indicated that Mr. Davis was not an escape threat, was not violent, and did not have any gang affiliation.

17.     Ms. Hernandez and Sergeant Martinez, at intake, should have completed a Screening Form for Suicide and Medical/Mental/Developmental Impairments form.  This form is issued by the Texas Commission on Jail Standards ("TCJS") and must be used by all Texas county jails.  The form produced by La Salle County for Mr. Davis's July 31, 2017 incarceration contained only the name of the county, the date, a reference to the identity of the screening officer, Mr. Davis's name and gender, and Mr. Davis's date of birth.  Neither Ms. Hernandez nor Sergeant Martinez completed the intake form as required by Texas law.

**Screening Form for Suicide and Medical/Mental/Developmental Impairment**

| County: LaSalle | Date: 11/30/10 | Name of Screening Officer: CPMS |
|---|---|---|

| Inmate's Name: Davis Jams | Gender: M | ☐ If female, pregnant? Yes ☐ No ☐ Unknown ☐ |
|---|---|---|

Serious injury/hospitalization in last 90 days? Yes ☐ No ☐ If yes, describe:

Currently taking any prescription medications? Yes ☐ No ☐ If yes, what:

Any disability/chronic illness (diabetes, hypertension, etc.) Yes ☐ No ☐ If yes, describe.

Does inmate appear to be under the influence of alcohol or drugs? Yes ☐ No ☐ If yes, describe.

Do you have a history of drug/alcohol abuse? If yes, note substance and when last used

\*Do you think you will have withdrawal symptoms from stopping the use of medications or other substances (including alcohol or drugs) while you are in jail?  If yes, describe

\*Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes ☐ No ☐ If yes, describe.

\*If yes, Notify Medical or Supervisor Immediately

*Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted*

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| **IF YES TO 1a, 1b,1c,or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | | |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | | | |
| 1c. Have you ever attempted suicide? If so, when and how? | | | |
| 1d. Are you feeling hopeless or have nothing to look forward to? | | · | |
| **IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGISTRATE. Notify Mental Health when warranted** | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | | | |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | | | |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | | | |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | | | |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | | | |
| 8. Have you ever received services for emotional or mental health problems? | | | |
| 9. Have you been in a hospital for emotional/mental health in the last year? | | | |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | | | |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs )? | | | |
| **IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY** | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | | | |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)? | | | |
| 15. Is the inmate incoherent, disoriented or showing signs of mental illness? | | | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | | |

Additional Comments (Note CCQ Match here):

| Magistrate Notification Date and Time: Electronic or Written (Circle) | Mental Health Notification Date and Time: | Medical Notification Date and Time: |
|---|---|---|

Supervisor Signature, Date and Time:

18.    Therefore, Ms. Hernandez and Sergeant Martinez failed to complete the magistrate form, which would have been required to be completed as a result of truthful answers to questions on the above-referenced form (had they been obtained).

LaSalle _____ County Jail

Inmate Mental Condition Report to Magistrate

NAME Davis, James Dean OFFENSE Warrant

ARRESTING AGENCY LSCO

BOOKING OFFICER B Hernandez _____ BOOKING TIME _____ DATE 7/31/17

The above inmates may have mental health issues based on

☐ Observation of law enforcement officer at time of arrest

☐ CCQ return show possible match

☐ Self admission by inmate at booking

☐ Subject is violent and appears to be a danger to themselves or others

☐ Medical evaluation by Emergency Room or other Medical Professional

☐ Previous arrest/medical records of the jail

☐ Observation of Jail Staff

☐ No Indication/No Notification Made

Details: _____

_____

_____

_____

As required by law, this notification is made to the magistrate in reference to an observation or report of possible mental illness by the above listed means. It is required within 72 hours after receiving credible information of reasonable cause to believe that a defendant committed to the Sheriff's custody: 1) Has mental illness 2) is a person with mental retardation or 3) the observations of the defendant's behavior immediately before, during and after the defendants arrest and the results of any previous assessment of the defendant for mental illness. (Art. 16.22 (a)

MAGISTRATE SIGNATURE: _____

MAGISTRATE NOTIFIED AT _____ ON _____ BY _____

                                                                    (Fax-Email-Direct)

OFFICER SENDING NOTIFICATION: _____

If Ms. Hernandez and/or Sergeant Martinez had completed the intake form, by law, they would have been required to complete the magistrate form based upon Mr. Davis's condition at the time of intake – serious and significant intoxication and/or impairment.  The failure to complete the State-required forms, and conduct the book-in process, showed deliberate indifference to Mr. Davis's known serious medical issues.  Mr. Davis was impaired as a result of methamphetamine use to the point that he would die without medical treatment.  This would be and was apparent and visibly evident to Ms. Hernandez and Sergeant Martinez, as it would be to anyone who had the education Ms. Hernandez and Sergeant Martinez, upon information and belief, had regarding jail prisoners and medical and mental health issues which are common in a Texas County jail setting.

19.     The La Salle County Sheriff's Office agrees that Mr. Davis was not booked-in, as it wrote in a written communication to Plaintiff's counsel when transmitting a response to a Public Information Act request:

> Enclosed is the jail file for Mr. James Dean Davis. At the time of arrest he was not booked in. Therefore this will be all the paperwork that will be available.
>
>
> Sincerely,
>
> Norma Miranda
>
> Admin. Asst.
>
> LaSalle County Sheriff's Office

There was no excuse for Sergeant Martinez and Jailer Hernandez not completing the book-in process, either by immediately completing the form or by completing portions required if they were unable to complete the book-in process as a result of Mr. Davis's serious medical condition.  Thus, by deliberately choosing not to complete the screening form, Sergeant Martinez and Jailer

Hernandez did not answer even the following questions on the form (which could have been answered based solely upon their observations of Mr. Davis):

- Does inmate appear to be under the influence of alcohol or drugs?
- Is the inmate unable to answer questions?  If yes, note why, notify supervisor and place on suicide watch until form completed.
- Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide?
- Does inmate show signs of depression (sadness, irritability, emotional flatness)?
- Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)?
- Is the inmate incoherent, disoriented or showing signs of mental illness?
- Inmate has visible signs of recent self-harm (cuts or ligature marks)?
- Additional comments [followed by space on the form to write additional comments regarding observations and/or the intake]

Jailer Hernandez knew, by interacting and communicating with Mr. Davis, that answers to these questions would indicate that Mr. Davis needed immediate medical assistance at a facility away from the jail.

20.    A La Salle County document, signed by Ms. Hernandez, indicates that Mr. Davis was arrested at 2:02 p.m. and arrived at the jail area at 2:20 p.m.  The document also indicates that the arresting officer was Rickey Galvan, the searching officer was Sergeant Martinez, and the intake officer was Jailer Hernandez.



21.     A Medical Information form completed for Mr. Davis, upon information and belief, at or about 2:20 p.m. on July 31, 2017, indicated that Mr. Davis was a drug addict, had a communicable disease, and was an alcoholic.  The document was signed by Jailer Hernandez.  A Medical Information Symptoms and Treatments form also, upon information and belief, completed at approximately the same time, was also signed by Jailer Hernandez.  That form indicated that Mr. Davis was a drug addict with a history or drug abuse, and had some alcohol abuse.

### 2.     Mr. Davis's Horrific Suffering and Unnecessary Death

#### a.     Texas Rangers Report

22.     Texas Ranger Randy Garcia investigated Ms. Davis's death, and he compiled a report.  The title of his report was: "Questionable Death / La Salle County / Victim: James Dean Davis."

23.     On August 1, 2017, at approximately 6:42 a.m., Ranger Garcia was contacted by La Salle County Sheriff's Office Captain Jose Garcia regarding Mr. Davis's death.  Captain Garcia requested Ranger Garcia's assistance regarding the investigation.  This is a common request when prisoners in jails in some Texas counties die under questionable circumstances.

24.     Ranger Garcia arrived at the La Salle County jail, at 703 North Main Street, Cotulla, Texas, at approximately 7:20 a.m.  La Salle County Justice of the Peace George Trigo told Ranger Garcia that he had pronounced Mr. Davis as being deceased at approximately 6:50 a.m.  Ranger Garcia was then informed of general facts regarding Mr. Davis's incarceration and death.

25.     Ranger Garcia observed Mr. Davis's body, as it laid face-up on a green mattress in a jail hallway.  There were visual indications that Mr. Davis had received medical treatment (from EMTs).  Ranger Garcia learned that Mr. Davis had been housed in Holding Cell Number 2 since

his arrival at the jail on July 31, 2017.  Moreover, that cell has a small glass window on the door, and a large window on the side of the cell.  There is also a bench, a toilet, and a sink in the cell, with the toilet and sink being behind a partition towards the rear of the cell.  Finally, there is a telephone mounted on the cell wall.  Ranger Garcia listed as witnesses people including Augustine Nathanial Ortiz, Jerod Ross Ramirez, Ransley Dontrell Bailey ("Mr. Bailey"), and Beatrice Marie Hernandez.

26.     Ranger Garcia obtained copies of relevant audio and video recordings from the La Salle County Sheriff's Office.  The recordings were saved to an external hard drive, which was in turn provided to Ranger Garcia.  The audio and video recordings were from Cameras 1 and 2 in the jail, mounted within the control room.  Camera 1 faces toward the booking area, and Camera 2 faces the booking area and the window of Holding Cell Number 2.  The Camera 1 recording contained both audio and video.  The Camera 2 recording contained only video.  Ranger Garcia, after reviewing relevant Camera 1 recordings, wrote the following regarding those recordings:

17.3     I reviewed the recording from Camera 1 and noted the following:

17.4     On 07-31-2017, at approximately 2:13 p.m., LCSO Sergeant Rickey Galvan escorted James Dean Davis, W/M, DOB xx-xx-1975, into the jail. Davis was wearing a white cut off shirt and appeared to have blood on the left chest. Davis was wearing gray shorts and shoes. Davis walked in with no assistance and sat down. Sergeant Galvan provided Davis with something to drink. Davis stated he was overheated and thanked Sergeant Galvan. I observed LCSO Jailer Francis Garza and LCSO Jailer Sergeant Yvette Martinez within the view of the camera. Davis took a drink of the water that Sergeant Galvan provided him.

17.5     Davis stated he had not eaten and LCSO Jail Administrator Dorothy "Dottie" Ramirez told him she was going to make him a sandwich. Davis stated he needed to lie down. Sergeant Galvan told Davis he did not want him to "pass out".

17.6     At approximately 2:22 p.m., Sergeant Martinez placed Davis into H2 Holding Cell. Davis walked into the cell without assistance and stood behind the window in the cell. Davis appeared to lie down after that.

17.7    At approximately 2:34 p.m., Jailer Garza placed an inmate into H2 Holding Cell. A man's voice could be heard moaning when Jailer Garza opened the door to the cell.

17.8    At approximately 2:35 p.m., Jailer Garza placed a blanket through the door slot of H2 Holding Cell.

17.9    At approximately 2:47 p.m., Davis peeked behind the lower portion of the window and was waving for attention until 2:48 p.m.

17.10   At approximately 2:53 p.m., Jailer Garza opened placed an inmate into H2 Holding Cell and I heard a male's voice ask, "Hey, can I please get some water?"

17.11   At approximately 3:22 p.m., Sergeant Martinez told Jailer Garza and Encinal Police Department Chief of Police Roy Vallejo, "We need to do something about Mr. Davis."  Jailer Garza escorted Chief Vallejo and an unknown male subject to H2 Holding Cell and Chief Vallejo spoke to another inmate in the cell. A male's voice was heard from the cell and stated, "Get this motherf[xxxx]r out of here!" Jailer Garza then hollered, "Davis!"

17.12   At approximately 3:26 p.m., a male's voice could be heard moaning, "Oh, oh God!" Sergeant Martinez yelled, "Hold on, Mr. Davis!"

17.13   At approximately 3:30 p.m., the voice continued, "Oh God!" and continued to moan until 3:34 p.m.

17.14   At approximately 3:38 p.m., Sergeant Martinez walked up to the window of H2 Holding Cell and asked, "What do you need, what's up" and "I'm really tired."

17.15   At approximately 3:44 p.m., Sergeant Martinez served dinner to the inmates in Holding 2 Cell and stated, "Hold on, Mr. Davis, hold on."

17.16   At approximately 3:47 p.m., Sergeant Martinez, opened the door to H2 Holding Cell and stated, "I'm gonna take care of you in a minute, Mr. Davis, hold on, just give me a second" and "Okay, sorry about that." Sergeant Martinez then stated, "Give me like 20 minutes at the most" and stated she was trying to house other inmates.

17.17   At approximately 4:24 p.m., Sergeant Martinez opened the door to H2 Holding Cell and removed an inmate from the cell. While she opened the door, moaning could be heard in the background. Sergeant Martinez spoke to someone within the cell and stated, "Hold on, let me take care of him first".

17.18   At approximately 4:27 p.m., someone moaned, "Ugh, ugh." Sergeant Martinez opened the door to H2 Holding Cell, removed a green mattress from the cell and mopped the floor in the cell.

17.19   At approximately 4:57 p.m., a briefing occurred in the control room which included Sergeant Martinez, Jailer Garza, LCSO Jailer Anna Olivarez, and LCSO Jailer Beatrice Hernandez. During the briefing, someone could be heard moaning, "Oh God, please, Lord." Jailer Garza told Jailer Hernandez, "Davis is back, he's not even eating anything either because he's coming down from whatever the hell he had."

17.20   At approximately 5:03 p.m., the intercom was activated and a male voice stated, "Take him to the hospital, this guy's going down". Jailer Garza responded, "Hold on." Jailer Garza told Jailer Hernandez, "Davis, well, he's withdrawing." At this time, Jailer Hernandez and Jailer Olivarez went up to H2 Holding Cell and Jailer Olivarez looked through the window.

17.21   At approximately 5:04 p.m., Jailer Garza told Sergeant Martinez, "Davis is saying he needs EMS, he needs to go to the hospital" and Sergeant Martinez responded, "For what?" Jailer Garza replied, "Isn't he just withdrawing?"

17.22   At this time, Jailer Hernandez spoke to Davis and she walked back into the control room and Jailer Garza laughed.

17.23   Sergeant Martinez then told Jailer Hernandez all she needed for her to do was to book in four inmates and then stated, "The man is taking HIV medication, he should have taken care of himself." Moaning, "Ugh", continued to be heard in the background.

17.24   At approximately 5:14 p.m., Sergeant Martinez stated she was going to call the jail before 10:00 p.m., and moaning, "Ugh, ugh", continued.

17.25   At approximately 5:22 p.m., the intercom was activated and a male subject stated, "I need help." LCSO Dispatcher Sarah Murray responded, "Okay sir, hold on." At this time, a hand was seen behind the lower portion of the window of H2 Holding Cell and Dispatcher Murray looked towards the window. Dispatcher Murray looked towards the window three different times.

17.26   At approximately 5:29 p.m., one of the jailers was talking and yelled, "I need help." Dispatcher Murray stated, "Mr. Davis was screaming like that."

17.27   At approximately 5:42 p.m., the moaning, "Ugh, ugh", sounded extremely loud in the background and Dispatcher Murray responded, "He having a baby?" Jailer Hernandez responded, "He's withdrawing."

17.28   Between 5:49 p.m. and 6:02 p.m., loud moaning continued to be heard and Davis started knocking on the lower portion of the window of H2 Holding Cell.

17.29   At approximately 6:03 p.m., Jailer Hernandez walked up to the door of H2 Holding Cell and stated, "Mr. Davis." Jailer Hernandez then walked to the booking

area and asked Jailer Olivarez for some "IBU's" and Jailer Olivarez handed her a small packet. Jailer Hernandez stated, "Gimme another one, le voy a tascar."

17.30   At approximately 6:58 p.m., Jailer Hernandez asked, "Is he puking in there again?" and Jailer Olivarez responded, "He's on the corner, he's coughing."

17.31   At approximately 7:11 p.m., Jailer Olivarez placed another inmate into Holding 2 Cell and while she did this, the moaning, "Oh God, ugh, oh God, oh my God", could be heard in the background.

17.32   At approximately 7:14 p.m., Jailer Olivarez entered Holding 2 Cell with a blanket and appeared to place it on the floor near the window where Davis was lying.

17.33   At approximately 7:52 p.m., Dispatcher Murray told Jailer Hernandez, "When EMS cleared Mr. Davis, Rickey 95'd him, he knew he had a warrant, so that's why, don't think he hasn't seen anybody today in reference to his sickness." Jailer Hernandez responded, "Oh no, he's withdrawing." Dispatcher Murray asked Jailer Hernandez, "He still throwing up?" and she responded, "He was and then he went to sleep."

17.34   At approximately 7:56 p.m., Jailer Hernandez answered the intercom and a male asked, "Can you go check in Holding Cell 2 cause that piece of shit is still curled up like a baby crying right there by the door because if he is, he's gonna be getting sick and throwing up all over the f[xx]king place." Jailer Hernandez responded, "Oh okay, okay, I know who you're talking about."

17.35   At approximately 8:18 p.m., loud banging could be heard in the background. The moaning, "Oh God, oh God, ugh, oh", could be heard in the background. Jailer Hernandez responded, "They're pissing me off, they're about to piss me off." Jailer Hernandez got up from the chair and walked into the back cells.

17.36   At approximately 8:46 p.m., the moaning, "Ugh, ugh", continued.

17.37   At approximately 9:20 p.m., Jailer Hernandez was booking an inmate and asked him, "That guy, still crying, right?" The inmate responded, "Yeah, there's nowhere else ya'll can hold anybody else?" "He's not gonna let anybody f[xx]king sleep." Jailer Hernandez responded, "I know, the thing is that he's coming off his stuff."

17.38   At approximately 9:28 p.m., moaning, "Ugh, oh God", could be heard.

17.39   I noticed the video skipped from 9:57:54 to 9:59:51 as I reviewed it.

17.40   At approximately 9:59 p.m., Jailer Hernandez spoke on the telephone and stated, "That he needs to go to the hospital, I go no, you need to sweat whatever

you have inside, you to sweat all that out, then we can take you to the hospital." She then stated, "Yes" and "Where am I supposed to put him, okay, alright, bye."

17.41  At approximately 10:59 p.m., an inmate asked Jailer Hernandez who wanted to go and live with him and she responded all of them would like to except one. The inmate asked which one and she replied, "The one that's all uuugggghhh, that one." Moaning, "Ugh, oh God, Ugh, oh God, oh God, ugh, ugh, oh God, oh God", continued.

17.42  On 08-01-2017, at approximately 12:21 a.m., an inmate in the booking area asked to use the restroom and Jailer Olivarez opened the door to H2 Holding Cell. The inmate entered the cell and moaning, "Ugh, oh, oh, ugh", could be heard.

17.43  At approximately 12:30 a.m., the moaning, "Uggghhh, ugghh", could be heard.

17.44  At approximately 12:38 a.m., Jailer Hernandez opened the door to H2 Holding Cell and the moaning, "Ugh, ugh, ugh, oh God", continued.

17.45  Between 12:44 a.m. and 1:00 a.m., the moaning, "Ugh, ugh, ugh, ugh, oh, oh God, ugh, oh, oh, ugh, oh God, Lord, I need help, ugh, I need help, I need help, ugh, ugh, ugh, ugh, oh, aw Jesus, oh, ugh, ugh, Lord, Lord, oh God, ugh, ugh, ugh, Lord" could be heard.

17.46  At approximately 1:24 a.m., the moaning, "Ugh, ugh, oh, oh, oh f[xx]k, I need an ambulance, oh, ugh, ugh", could be heard and Dispatcher Murray responded, "Sounds like he's having a heart attack."

17.47  Between 1:47 a.m. and 2:49 a.m., "Ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, Lord, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, ugh, ugh, oh God, ugh, ugh, oh God, ugh, ugh, ugh, oh God, ugh, oh God, oh, ugh, ugh, ugh, ugh, oh God, ugh, ugh, oh, oh God, God, oh," could be heard.

17.48  Music was playing in the control room during this time and it was difficult to hear over the music.

17.49  Between 3:08 a.m. and 3:15 a.m., the moaning, "ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, ugh, oh God, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, oh God, ugh, ugh, ugh, ugh, oh Lord" continued and LCSO Deputy Andy Flores entered the control room and asked Jailer Hernandez., "Which Davis?" She responded, "James Davis, James Dean Davis." Deputy Flores asked, "What's the matter with him?" She replied, "He's coming off of the shit."

17.50  At approximately 3:17 a.m., Jailer Hernandez entered H2 Holding Cell and I could hear the moaning, "Ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh god, ugh, ugh, ugh".

17.51   At approximately 3:32 a.m., the moaning, "Ugh, ugh, ugh, ugh", continued.

17.52   Between 3:58 a.m. and 4:49 a.m., the moaning, "Ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh, oh God, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, ugh, ugh, ugh, ugh, oh God, ugh, ugh," continued. At approximately 4:48 p.m., Jailer Hernandez walked by H2 Holding Cell and took a glance towards the window of the cell. The moaning, "Ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh~, continued.

17.53   At approximately 4:59 a.m., Jailer Garza entered the control room and Sergeant Martinez entered it at approximately 5:00 a.m. Sergeant Martinez looked towards Holding 1 Cell and stated, "Sit down, ya, ya, corta tu pedo." A briefing occurred in the control room at this time involving Sergeant Martinez, Jailer Marie Aguilar, Jailer Hernandez, and Jailer Garza, at this time. Sergeant Martinez asked Jailer Hernandez, "What happened last night?"

17.54   During the briefing, the moaning, "ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh", continued.

17.55   Sergeant Martinez asked Jailer Hernandez what was going on and she replied everyone had been booked, but she had not fingerprinted Davis yet.

17.56   Jailer Garza asked, "What's up with Davis?" and Jailer Hernandez replied, "He's withdrawing, the only time he does that is when he hears people or he hears the door slam, knowing that we're around there, he'll start, and that's why this one keeps on waking up and telling him, shut up."

17.57   The briefing continued and the moaning, "Ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, oh God, ugh, ugh, ugh, ugh" continued. Jailer Garza asked, "Oh my God, it's freaking annoying" and mimicked the moaning and moaned, "Uuggghhh", and stated, "Like shut up!" Jailer Hernandez laughed.

17.58   Between 5:27 a.m. and 5:32 a.m., the moaning, "Ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, oh God, ugh, ugh, God, oh God, ugh, ugh, ugh, ugh" continued and became louder. Jailer Garza turned around towards H2 Holding Cell and stated, "Uuggghhh". Jailer Garza appeared to be upset. At this time the moaning, "Ugh, ugh, ugh, oh God, uuuuugggghhhh, uuuuugggghhhh" was getting very loud.

17.59   At approximately 5:38 a.m., the moaning, "Ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, Lord", continued and Sergeant Martinez stated, "Aye, este senior se me va volar." The moaning, "Ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh,

ugh", continued and Jailer Garza stated, "I'm surprised they haven't told him to shut up, the other guys in there." Sergeant Martinez turned the music on during this time. The moaning, "Ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh", continued and it sounded lower and lower.

17.60   At approximately 6:00 a.m., the moaning continued and Sergeant Martinez stated, "This dude sounds like he's in f[xx]king heat", and Jailer Garza replied, "He wasn't even like that."

17.61   The moaning, "Ugh, ugh, oh God, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, ugh, oh God, ugh, ugh, ugh, ugh, ugh, ugh, ugh", continued until approximately 6:13 a.m.

17.62   At approximately 6:29 a.m., the intercom was activated and Sergeant Martinez got up from the chair in the control room and answered it. The video skipped from 6:29:17 to 6:29:31. Sergeant Martinez put gloves on her hands and stated, "I don't know, I need to go out to the holding cell, huh, inmate's breathing." At this time, one of the inmates could be seen looking through the window of H2 Holding Cell.

17.63   At approximately 6:30 a.m., Sergeant Martinez entered H2 Holding Cell and stated, "Mr. Davis, Mr. Davis, Mr. Davis, Mr. Davis!" Sergeant Martinez then yelled, "Hey, page out EMS, we have a non-responsive inmate!" Sergeant Martinez continued yelling, "Mr. Davis, Mr. Davis, Mr. Davis, Mr. Davis, Mr. Davis, Mr. Davis, Mr. Davis, Mr. Davis, Mr. Davis!" Sergeant Martinez yelled, "I need someone to check his pulse!" Jailer Garza responded to H2 Holding Cell and told LCSO Dispatcher Denise Jimenez, "I don't feel a pulse."

17.64   Dispatcher Jimenez stated the "EMS" was responding from Artesia Wells. Sergeant Martinez replied, "I can't stop!"

17.65   At approximately 6:34 a.m., LCSO Deputies Jose Avila and Michael Sauceda entered the jail.

17.66   At approximately 6:40 a.m., La Salle County Justice of the Peace, Precinct #3, George Trigo entered the jail and at approximately 6:42a.m., the La Salle County Emergency Medical Services entered the jail.


27.     Every reasonable jailer, every reasonable law enforcement officer, and every reasonable person in the United States would agree that what Ranger Garcia describes above was blatant, unmitigated, deliberate indifference, and so beyond the pale as to be extremely objectively unreasonable.  The manner in which Defendants disregarded Mr. Davis, made jokes at his expense,

and apparently wanted him to linger and die, is disgusting.  There is really no description that merits the above-described series of events.  However, for legal purposes, there is no doubt that it meets the constitutional standard for claims against natural person Defendants asserted in this pleading.

28.    Upon information and belief, the following descriptions, used above, refer to the following people:

| Description | Name |
|---|---|
| Jailer Aguilar | Marie Aguilar |
| Sergeant Galvan | Rickey Galvan |
| Jailer Garza | Francisca G. Garza a/k/a Frances Garza |
| Jailer Hernandez | Beatrice Marie Hernandez |
| Sergeant Martinez | Yvette Marie Martinez |
| Dispatcher Murray | Sarah Elizabeth Murray |
| Jailer Olivarez | Ana Maria Olivarez a/k/a Anna Maria Olivarez |
| Jail Administrator Dorothy Ramirez | Dorothy "Dottie" Ramirez |
| Chief Vallejo | Roy Vallejo |

29.    It was clear from the very beginning that Mr. Davis should not have been kept in the County jail in the condition in which he arrived.  This was further evidenced by his condition and pleas for help from that time until shortly before he died on August 1, 2017.  Jail Administrator Ramirez said that she would make him a sandwich, shortly after Mr. Davis had arrived.  Upon information and belief, did so because she observed his perilous condition.  This was acknowledged by Sergeant Galvan telling Mr. Davis, presumably based upon his observation of him, that he did not want Mr. Davis to "pass out."

30.    Sergeant Martinez telling Jailer Garza and Encinal Police Department Chief of Police Roy Vallejo, "We need to do something about Mr. Davis," was evidence that both Sergeant Martinez and Jailer Garza knew early on, at approximately 3:22 p.m. on July 31, 2017, that Mr.

Davis should not be kept in the county jail.  He needed emergency medical treatment and should have been transferred to an area hospital.  Numerous other references above to Sergeant Martinez's interaction with Mr. Davis, and others' knowledge of Mr. Davis's condition and hearing his moans and pleas for help, show their deliberate indifference and objective unreasonableness when dealing with Mr. Davis.  Sergeant Martinez's deliberate indifference and objective unreasonableness caused, was a proximate cause of, and led to Mr. Davis's death.

31.     Jailer Garza likewise is liable for Mr. Davis's death.  The above-referenced briefing in the control room occurring at approximately 4:57 p.m. on July 31, 2017 included Jailer Garza. Jailer Garza could hear Mr. Davis moaning and saying, "Oh God, please, Lord."  Mr. Davis was begging and pleading for help.  Jailer Garza ignored his begging and pleading and chose to do nothing.  Instead, she simply told Jailer Hernandez, "Davis is back, he is not even eating anything either because he is coming down from whatever the hell he had."   Jailer Garza chose not to intervene but to ignore Mr. Davis.  Jailer Garza also, when being told by a male voice, presumably another prisoner, "Take him [Mr. Davis] to the hospital," because he is "going down," still did not assure that he was removed from the facility and taken to a hospital.  She just noted that he was "withdrawing."  Jailer Garza told Sergeant Martinez, "Davis is saying he needs EMS" and "needs to go to the hospital."  However, this was not concern for Mr. Davis but merely a statement of fact. Jailer Garza orally said, "Isn't he just withdrawing?"  She then laughed as she went back to the control room.  Other explicit and/or implicit references above to Sergeant Garza's interaction with Mr. Davis, others regarding Mr. Davis, and/or hearing Mr. Davis's moans and pleas for help show her deliberate indifference and objective unreasonableness when dealing with Mr. Davis.  This deliberate indifference and objective unreasonableness caused, was a proximate cause of, and led to Mr. Davis's death.

32.     Jailer Olivarez likewise was deliberately indifferent to Mr. Davis's serious medical needs and knew, upon information and belief, that he would die without emergency medical treatment.  Jailer Olivarez also participated in the 4:57 p.m. briefing on July 31, 2017.  Thus, she heard Mr. Davis's begging and pleas for help, and moaning and saying, "Oh God, please, Lord." Jailer Olivarez also observed Mr. Davis and/or heard his moaning, and his saying, "Oh God, ugh, oh God, oh my God," when she placed another inmate into Holding Cell Number 2 at approximately 7:11 p.m. on July 31, 2017.  Instead of providing Mr. Davis needed medical care, and/or insisting that a supervisor obtain such care, and/or call someone outside the jail if a supervisor or co-worker refused to take action, she merely put a blanket into the cell.  Other interaction by and knowledge of by Jailer Olivarez referenced in this pleading supports liability for claims asserted against her in this case.  Other explicit and/or implicit references in this pleading to Sergeant Olivarez's interaction with Mr. Davis, others regarding Mr. Davis, and/or hearing Mr. Davis's moans and pleas for help, show her deliberate indifference and objective unreasonableness when dealing with Mr. Davis.  This deliberate indifference and objective unreasonableness caused, was a proximate cause of, and led to Mr. Davis's death.

33.     Jailer Hernandez also participated in the July 31, 2017, 4:57 p.m. briefing, and she learned the same information other Defendants learned and which is referenced above.  She also signed the Screening Form for Suicide and Medical/Mental/Developmental Impairments form, but deliberately chose not to complete it and/or include any information at all in it other than that referenced in this pleading.  This alone was deliberate indifference, a clear violation of TCJS standards, and objectively unreasonable.  Jailer Hernandez had significant interaction with and/or learned significant information about Mr. Davis's serious and life-threatening medical needs as referenced above.  Other explicit and/or implicit references above to Jailer Hernandez's interaction with Mr. Davis, others regarding Mr. Davis, and/or  hearing Mr. Davis's moans and pleas for help

show her deliberate indifference and objective unreasonableness when dealing with Mr. Davis. This deliberate indifference and objective unreasonableness caused, was a proximate cause of, and led to Mr. Davis's death.

34.     Dispatcher/Jailer Murray likewise is liable for claims asserted against her in this pleading.  As shown above, at approximately 5:22 p.m. on July 31, 2017, the intercom was activated and a male subject said that he needed help.  Dispatcher/Jailer Murray looked towards the window of Holding Cell Number 2, and then noted at approximately 5:29 p.m., "Mr. Davis was screaming like that."  The extremely loud moaning of Mr. Davis at approximately 5:42 p.m., referenced above, was heard by Dispatcher/Jailer Murray.  Dispatcher/Jailer Murray did not pursue obtaining medical treatment for Mr. Davis but instead joked about his horrific pain and suffering, "He having a baby?"  She thereafter did nothing to obtain medical treatment for Mr. Davis, even though she knew he had been throwing up and was seriously ill.  Other explicit and/or implicit references above to Dispatcher/Jailer Murray's interaction with Mr. Davis, others regarding Mr. Davis, and/or hearing Mr. Davis's moans and pleas for help show her deliberate indifference and objective unreasonableness when dealing with Mr. Davis.  This deliberate indifference and objective unreasonableness caused, was a proximate cause of, and led to Mr. Davis's death.

35.     Administrator Ramirez is likewise liable for claims asserted against her in this pleading.  She was fully aware that Mr. Davis had significant health issues when he arrived at the jail, and she did not call EMS.  Administrator Ramirez also was seemingly at a loss, when providing her statement to Ranger Garcia and Investigator Gonzalez, as to how to confirm that jail staff had received appropriate training and/or instruction.  Upon information and belief, staff had not been appropriately trained as to how to deal with Mr. Davis.  Thus, there is also liability for La Salle County for the failure to appropriately train its jailers.  Administrator Ramirez was likewise responsible to supervise all people under her control and to assure, especially in light of

her knowledge that Mr. Davis was seriously ill, that he was cared for appropriately through the night by, through but not including, having him examined by EMS personnel and ultimately taken to an area hospital.  Her failure to supervise, as well as to individually take action to obtain needed medical treatment for Mr. Davis, demonstrated her deliberate indifference and objectively unreasonably.  This was a proximate cause of and led to Mr. Davis's unnecessary death.

36.     Ranger Garcia, after reviewing relevant Camera 2 recordings, wrote the following regarding those recordings:

18.3    On 07-31 2017, at approximately 2:31 p.m., LCSO Jailer Francis Garza opened the door to the H2 Holding Cell and provided a blanket to one of the inmates. An observation was indicated on the LCSO Jail Observation Log.

18.4    At approximately 2:32 p.m., inmate James Dean Davis, W/M, DOB xx-xx-1975, appeared to lie down. I could see this through the H2 Holding Cell window.

18.5    At approximately 2:52 p.m., Davis peeked through the lower portion of the window of H2 Holding Cell, and knocked on the window. At approximately 2:53p.m., Davis lied down.

18.6    At approximately 2:53 p.m., Jailer Garza placed an inmate into H2 Holding Cell.

18.7    At approximately 2:54 p.m., LCSO Sergeant Rickey Galvan handed a styrofoam cup to Davis. **The observation log indicated an observation was made at 3:00 p.m. and no observation was done at this time.**

18.8    At approximately 3:22 p.m., City of Encinal Chief of Police Roy Vallejo walked up to the H2 Holding Cell door and looked through the slot. The observation log indicated an observation was conducted at 3:20 p.m.

18.9    At approximately 3:25 p.m., Chief Vallejo and a Hispanic male walked up to the window of H2 Holding Cell and looked inside.

18.10   At approximately 3:37 p.m., Jailer Garza and LCSO Jailer Sergeant Yvette Martinez walked up to the H2 Holding Cell window and Sergeant Martinez looked inside.

18.11   At approximately 3:44 p.m., Sergeant Martinez opened the slot on the door of H2 Holding Cell and placed styrofoam food containers through the slot.

18.12   At approximately 3:47 p.m., Sergeant Martinez placed additional items through the slot of H2 Holding Cell.

18.13   At approximately 3:48 p.m., Sergeant Martinez walked up to the H2 Holding Cell window and looked inside. The observation log indicated an observation was made at 3:50 p.m.

18.14   **At approximately 3:56 p.m., Sergeant Martinez and Jailer Garza walked by H2 Holding Cell with trays. The observation log indicated an observation was conducted at 4:01p.m.**

18.15   At approximately 4:23 p.m., Sergeant Martinez opened the slot on the H2 Holding Cell door, leaned over and looked inside. The observation log indicated an observation was conducted at 4:20 p.m.

18.16   At approximately 4:24 p.m., Sergeant Martinez removed an inmate from H2 Holding Cell.

18.17   At approximately 4:21 p.m., Sergeant Martinez opened the door to H2 Holding Cell and mopped the floor inside the cell.

18.18   At approximately 4:28 p.m., Sergeant Martinez opened the door to H2 Holding Cell, tossed an item to an inmate, and closed the door.

18.19   **The observation log indicated an observation was conducted at 4:50 p.m. No observation was conducted at this time.**

18.20   At approximately 5:03 p.m., LCSO Jailer Anna Maria Olivarez looked through the window of H2 Holding Cell, and at approximately 5:04 p.m., Jailer Olivarez looked through the window once again. LCSO Jailer Beatrice Hernandez opened the door of H2 Holding Cell at this time and then closed it. The observation log indicated an observation was conducted at 5:00 p.m.

18.21   **The observation log indicated an observation was conducted at 5:25 p.m. and 5:41 p.m. During both of these times, Jailer Olivarez stood behind the corner wall of the control room and could not be seen within the view of the camera. This wall blocks the view to the H2 Holding Cell window.**

18.22   At approximately 5:39 p.m., Davis peeked through the lower portion of the window and knocked on the window. Davis knocked once again and no jailers could be seen at this time.

18.23   At approximately 6:02 p.m., Davis peeked through the lower portion of the window of H2 Holding Cell and knocked on the window. Jailer Hernandez responded to the door of H2 Holding Cell and looked through the window on the door. Jailer Hernandez then placed some items through the slot of H2 Holding Cell door. The observation log indicated an observation was conducted at 6:00 p.m.

18.24 **The observation log indicated an observation was conducted at 6:30 p.m. No observation was conducted at this time.**

18.25 At approximately 7:10 p.m., Jailer Olivarez opened the door to H2 Holding Cell and placed a green mattress into the cell. Jailer Olivarez then handed a white sheet to an inmate within H2 Holding Cell. Jailer Olivarez then entered the cell and collected trash from the cell. **The observation log indicated an observation was conducted at 7:00 p.m.**

18.26 At approximately 7:14 p.m., Jailer Olivarez entered H2 Holding Cell with a blanket.

18.27 **The observation log indicated an observation was conducted at 7:30 p.m. No observation was conducted at this time.**

18.28 At approximately 7:58 p.m., Jailer Hernandez walked up to H2 Holding Cell and looked through the door window. The observation log indicated an observation was conducted at 8:00 p.m.

18.29 At approximately 8:36 p.m., Jailer Hernandez opened the door to H2 Holding Cell and removed an inmate from the cell. **The observation log indicated an observation was conducted at 8:30 p.m.**

18.30 At approximately 9:06 p.m., Jailer Hernandez opened the door to H2 Holding Cell and removed an inmate from the cell. **The observation log indicated an observation was conducted at 9:00 p.m.**

18.31 At approximately 9:15 p.m., Jailer Olivarez placed an inmate into H2 Holding Cell.

18.32 At approximately 9:22 p.m., Jailer Olivarez opened the door to H2 Holding Cell and handed a plate to an inmate.

18.33 At approximately 9:25 p.m., Jailer Hernandez looked through the window on the H2 Holding Cell door and placed an item through the slot. **The observation log indicated an observation was conducted at 9:30 p.m.**

18.34 At approximately 9:43p.m., Jailer Olivarez placed an inmate into H2 Holding Cell.

18.35 At approximately 9:44 p.m., Jailer Olivarez opened the door of H2 Holding Cell and handed an item to an inmate.

18.36 **The observation log indicated an observation was conducted at 10:00 p.m. Inmates were busy making telephone calls in a different section of the jail and no observation was conducted on H2 Holding Cell at this time.**

18.37  **The observation log indicated an observation was conducted at 10:30 p.m., and the inmates were still busy making telephone calls. No observation was conducted at this time**.

18.38  At approximately 10:58 p.m., Jailer Olivarez looked through the window of H2 Holding Cell. The observation log indicated an observation was conducted at 11:00 p.m.

18.39  **The observation log indicated an observation was conducted at 11:30 p.m. The inmates were once again making telephone calls and no observation of H2 Holding Cell was made.**

18.40  At approximately 11:52 p.m., Jailers Olivarez and Hernandez escorted an inmate and stopped by the front door of H2 Holding Cell. **The observation log indicated an observation was conducted at 12:00 a.m.**

18.41  At approximately 12:20 a.m., Jailer Olivarez opened the door to R2 Holding Cell and an inmate walked inside the cell.

18.42  At approximately 12:22 a.m., Jailer Olivarez looked through the window of H2 Holding Cell. At this time, the inmate Jailer Olivarez removed the inmate from the cell.

18.43  At approximately 12:25 a.m., Jailer Hernandez looked through the door window of H2 Holding Cell. **The observation log indicated an observation was conducted at 12:30 a.m.**

18.44  At approximately 12:38 a.m., Jailer Hernandez opened the door to H2 Holding Cell and handed orange clothing to an inmate.

18.45  At approximately 12:57 a.m., Jailer Hernandez removed this inmate from H2 Holding Cell.  The observation log indicated an observation was conducted at 1:00 a.m.

18.46  **The observation log indicated an observation was conducted at 1:30 a.m. Jailer Hernandez was inside the control room doing paperwork at this time and did not conduct an observation of H2 Holding Cell**.

18.47  **The observation log indicated an observation was conducted at 2:00 a.m., and at this time, Jailer Hernandez walked by H2 Holding Cell and walked down a different section of the jail.**

18.48  **The observation log indicated an observation was conducted at 2:30 a.m. Jailer Hernandez was in and out of the control room during this time and no observation of H2 Holding Cell was conducted.**

18.49   **The observation log indicated an observation was conducted at 3:00 a.m. No observation was conducted on H2 Holding Cell at this time.**

18.50   At approximately 3:17 a.m., Jailer Hernandez entered H2 Holding Cell an removed an inmate.

18.51   At approximately 3:32 a.m., Jailer Hernandez placed the inmate into H2 Holding Cell and he grabbed an item and came back out of the cell. The observation log indicated an observation was conducted at 3:30 a.m.

18.52   At approximately 3:34 a.m., Jailer Hernandez placed the inmate back inside H2 Holding Cell.

18.53   **The observation log indicated an observation was conducted at 4:00 a.m. No observation was conducted on H2 Holding Cell at this time**.

18.54   **The observation log indicated an observation was conducted at 4:30 a.m. No observation was conducted on H2 Holding Cell at this time.**

18.55   At approximately 4:46 a.m., Jailer Hernandez looked through the window of H2 Holding Cell.

18.56   **The observation log indicated and observation was conducted at 5:00 a.m. and 5:01 a.m.  Sergeant Martinez, Jailer Hernandez, Jailer Garza, and LCSO Jailer Marie Aguilar participated in a briefing in the control room at this time and no observations of H2 Holding Cell were conducted**.

18.57   The briefing concluded at approximately 5:34 a.m., and at approximately 5:44 a.m., Jailer Garza looked through the window of H2 Holding Cell. The observation log indicated an observation was conducted at 5:44 a.m.

18.58   At approximately 6:28 a.m., an inmate in H2 Holding Cell looked through window and knocked two times. Sergeant Martinez was doing paperwork in the control room at this time and looked at the inmate. Sergeant Martinez waived at the inmate with her right hand and motioned for him to wait.

18.59   At approximately 6:29 a.m., Sergeant Martinez got up from the chair and answered the intercom.

18.60   At approximately 6:30 a.m, Sergeant Martinez entered H2 Holding Cell and walked back out.

(Emphasis added).

37.     Upon information and belief, La Salle County provided to Ranger Garcia a copy of a portion of a form entitled La Salle County Jail Facility Checks.

| Time Check | Holding Cell 1 | Holding Cell 2 | Seg 1 | Seg 2 | Seg 3 | Non-Cont Inm. Vis. | Indoor Rec Yard | Dorm A1 | Dorm A2 | Dorm B1 | Dorm B2 | Dorm C1 | Dorm C2 | Dorm D1 | Dorm D2 | Ho CH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0500-0530 | | | | | | | | | | | | | | | | |
| 0530-0600 | | | | | | | | | | | | | | | | |
| 0630-0700 | | | | | | | | | | | | | | | | |
| 0730-0800 | | | | | | | | | | | | | | | | |
| 0830-0900 | | | | | | | | | | | | | | | | |
| 0900-0930 | | | | | | | | | | | | | | | | |
| 1000-1030 | | | | | | | | | | | | | | | | |
| 1100-1130 | | | | | | | | | | | | | | | | |
| 1200-1230 | | | | | | | | | | | | | | | | |
| 1300-1330 | | | | | | | | | | | | | | | | |
| 1400-1430 | | | | | | | | | | | | | | | | |
| 1500-1530 | | | | | | | | | | | | | | | | |
| 1600-1630 | | | | | | | | | | | | | | | | |
| 1700*-1730 | | | | | | | | | | | | | | | | |
| 1800-1830 | | | | | | | | | | | | | | | | |
| 1900-1930 | | | | | | | | | | | | | | | | |
| 2000-2030 | | | | | | | | | | | | | | | | |
| 2100-2130 | | | | | | | | | | | | | | | | |
| 2200-2230 | | | | | | | | | | | | | | | | |
| 2300-2330 | | | | | | | | | | | | | | | | |
| 2400-2430 | | | | | | | | | | | | | | | | |
| 0100-0130 | | | | | | | | | | | | | | | | |
| 0200-0230 | | | | | | | | | | | | | | | | |
| 0300-0330 | | | | | | | | | | | | | | | | |
| 0400-0430 | | | | | | | | | | | | | | | | |
| 0500- | | | | | | | | | | | | | | | | |

LA SALLE COUNTY JAIL  FACILITY CHECKS                                     STA

* Asterik  notes  Shift Change          This is a government  doocument  any falsification or ommissions is a violation of law
In accordance with TCJS 265 .3    Holding Cell or detoxification cell shall be observed by personnel at intervals not to ex
In accordance with TCJS 275 .1  Ensure that each inmate is observed, face to face, by a jailer at least once every 60 minu

Further, upon information and belief, La Salle County never provided such a completed form for the relevant time period when Mr. Davis was in the La Salle County jail.

38.     The form would have allowed someone to record observations of Holding Cell 2, as well as other cells in the La Salle County jail.  The form also makes it clear to anyone using it that it is "a government do[ ]cument [and] any falsification or om[ ]issions is a violation of law . . . ."  The form also addresses face-to-face observations, which are required by TCJS standards.

All Defendants, upon information and belief, would have been very familiar with the form and its warnings and requirements printed at the bottom.

b.      Witness Statements

39.      Ranger Garcia also took a number of witness statements regarding his investigation of Mr. Davis's death.  Portions of Ranger Garcia's summaries of relevant witness statements are set forth in this section of the complaint.

(1)      Marie Aguilar – Jailer

40.      On August 1, 2017 at approximately 1:43 p.m., Ranger Garcia and Lamar County Sheriff's Office investigator Esmeralda Gonzalez interviewed jailer Marie Aguilar in the La Salle County Sheriff's Office interview room.  Jailer Aguilar was a cook and jailer for the jail, and her primary duty was to cook.  She said that she had been working for La Salle County for approximately 4 years at that time, and originally began working for the County in 2003 as a cook.  Jailer Aguilar said that she worked from 5:00 a.m. to 5:00 p.m. on July 31, 2017, and again on August 1, 2017.  She also said that she went on a transport around 1:15 p.m. on July 31, 2017, and arrived back at the jail at approximately 7:30 p.m. that evening.  Upon information and belief, the "transport" was transporting a prisoner to another location.  Thus, the ability to transport prisoners to other locations, including the ability to transport Mr. Davis to a local emergency room for emergency medical treatment, was available to all natural person Defendants.  Regardless, the natural person Defendants could have simply called emergency medical services for ambulance transport.

41.      Ms. Aguilar said that she heard about Mr. Davis passing away.  She also said that she did not have any interaction with him on July 31, 2017.  However, she said that when she attended the daily briefing on August 1, 2017, she could hear an inmate moaning.  Upon

information and belief, that inmate was Mr. Davis.  Jailer Aguilar said that she then walked into

the kitchen and started preparing breakfast.  She remembered hearing Sergeant Martinez yelling,

and she saw the door to Holding Cell Number 2 open.  She looked into the cell and saw Sergeant

Martinez performing what she understood to be CPR on an inmate.  Jailer Aguilar recalled that

she had seen Mr. Davis in the past.

<u>(2)     Ransley Dontrell Bailey – Prisoner</u>

42.     On August 1, 2017, at approximately 9:35 a.m., Ranger Garcia and Investigator

Gonzalez interviewed Ransley Dontrell Bailey in the La Salle County Sheriff's Office interview

room.  Initially, when Ranger Garcia spoke with Mr. Bailey, Ranger Garcia learned that Mr. Bailey

knew Mr. Davis before they were both incarcerated in the La Salle County jail when Mr. Davis

died.  Mr. Bailey told Ranger Garcia that Mr. Bailey had checked on Mr. Davis on the morning

before his arrest, and that Mr. Davis "looked bad."  Mr. Bailey said that Mr. Bailey was then

arrested and placed inside Holding Cell Number 2 with Mr. Davis.  Upon information and belief,

Mr. Davis still "looked bad" at the time he arrived at the La Salle County jail on July 31, 2017.

43.     Mr. Bailey said that he, Mr. Davis, and another male prisoner were inside Holding

Cell Number 2.  Mr. Bailey said that Mr. Davis was lying on a mattress in the cell and looked ill.

He also said that Mr. Davis kept saying he did not feel well, and wanted to see a doctor.  Mr. Bailey

also said that Mr. Davis kept asking for help all night.  Mr. Bailey said that he activated the

intercom for Mr. Davis, so that he could ask La Salle County jail staff for help.  Mr. Bailey told

Ranger Garcia that Mr. Bailey spoke to jail staff by intercom and through the window

approximately two times and told them that Mr. Davis needed help.  Mr. Bailey told Ranger Garcia

that he believed jail staff did not believe him.  Upon information and belief, jail staff did believe

him but chose to be deliberately indifferent to and ignore Mr. Davis's serious and life-threatening medical needs.

44.     Mr. Bailey also said that he did not sleep much that night, because Mr. Davis kept asking for help and calling out his name.  He said that Mr. Davis was not wearing a shirt inside the cell.  Mr. Bailey also said that someone named "Musconi" told Mr. Bailey earlier that Mr. Davis was falling down and could not walk.  Upon information and belief, all jailers and dispatchers on duty ignored Mr. Davis's pleas for help and chose to be deliberately indifferent and act in an objectively unreasonable manner considering Mr. Davis's condition and impending death.

### (3)     Antonio Garcia – Acquaintance of Mr. Davis

45.     On August 1, 2017, at approximately 12:48 p.m., Investigator Gonzalez and Ranger Garcia interviewed Antonio Garcia in the La Salle County Sheriff's Office interview room.  Mr. Garcia knew Mr. Davis, and he said that he saw Mr. Davis at approximately 1:30 p.m. on July 31, 2017.  He said that Mr. Davis was walking "like a Zombie," and fainted and fell down.  Mr. Garcia said that he helped Mr. Davis get up, and then walked him to Mr. Garcia's RV.  Mr. Davis told Mr. Garcia that Mr. Davis was sick and needed help.  Mr. Garcia, after Mr. Davis indicated he did not want Mr. Garcia to call an ambulance, took a shower.  While Mr. Garcia was taking a shower, he heard the sound of Mr. Davis falling off of the couch.  Mr. Garcia picked up Mr. Davis and called for an ambulance.  Mr. Davis was unconscious when Mr. Garcia found him on the floor, but Mr. Davis ultimately was able to stand up and was "acting like nothing was wrong" when the ambulance arrived.  Mr. Garcia indicated that La Salle County Sheriff's deputies then arrived at the RV Park on a different call and arrested Mr. Davis due to an alleged outstanding warrant.  Upon information and belief, Mr. Garcia's description of Mr. Davis was accurate and in part described

how Mr. Davis looked when he was ultimately incarcerated in the La Salle County jail later that day.

### (4)   Francis Garza – Jailer (2 Interviews)

46.    On August 1, 2017, at approximately 1:08 p.m., Investigator Gonzalez and Ranger Garcia interviewed Defendant Jailer Francis Garza in the La Salle County Sheriff's office interview room.  Jailer Garza said that she had been employed as a jailer with the La Salle County Sheriff's Office since October 2016, and had previously worked for the Frio County Sheriff's Office for approximately 8 years.  Jailer Garza said that she worked from 5:00 a.m. to 5:00 p.m. on July 31, 2017, and worked the same hours on August 1, 2017.  She said that she worked both days with Sergeant Martinez and Jailer Marie Aguilar.

47.    Jailer Garza said that she did not have any interaction with Mr. Davis.  This was false.  She said that she only remembered seeing him drinking water or juice that Sergeant Galvan had given to him.  However, after further conversation, Jailer Garza said that she had to open the food slot to Mr. Davis's cell to tell Mr. Davis to calm down because he was allegedly getting loud with one of the other inmates.  Upon information and belief, Jailer Garza's statement was made to cover up the fact that Ms. Garza was deliberately indifferent to Mr. Davis's known serious medical needs.  Upon information and belief, she observed Mr. Davis and saw that he was so ill that he would need emergency medical treatment.

48.    Jailer Garza, trying to cover her tracks, said that Mr. Davis never asked her for medical assistance and never told her he was in pain or needed help.  This was false.  As shown elsewhere in this pleading, Jailer Garza told Sergeant Martinez, "Davis is saying he needs EMS, he needs to go to the hospital."  Jailer Garza also said that she recalled hearing someone say that Mr. Davis was not feeling well when she was about to leave work on July 31, 2017.  Jailer Garza was attempting to minimize her involvement in Mr. Davis's death by making such a seemingly

innocuous statement.  She also knew that Mr. Davis had vomited and was gasping for air and breathing heavily when he had first arrived at the jail.  She also recalled that Mr. Davis was sweating at the time.

49.     Jailer Garza further said that, when she got to work on the morning of August 1, 2017, she noticed that Mr. Davis was looking around and moaning.  She said that she attended the daily briefing that morning, and it lasted longer than usual.  She said that she would normally pass out inmate medications at about 6:00 a.m. but instead cleaned the dirty lounge and made coffee for Justice of the Peace George Trigo.  She said that she then walked to the medical area after cleaning the lounge and heard Mr. Davis moaning.  She saw Mr. Davis in the cell lying face up, looking around in all directions.  Jailer Garza said that she had looked at the clock, and it was 6:00 a.m. at that time.  As shown elsewhere in this pleading, Jailer Garza also said that morning, "Oh my God, it's freaking annoying."  She then mimicked Mr. Davis's moaning, "Uuggghhh," and stated, "Like shut up!"  Jailer Hernandez laughed at Jailer Garza's disgusting deliberate indifference to and mocking of Mr. Davis.  Upon information and belief, it was apparent to both Jailer Hernandez and Jailer Garza that Mr. Davis was dying.

50.     On November 13, 2017, at approximately 4:16 p.m., Ranger Garcia interviewed Jailer Garza a second time in the La Salle County Sheriff's Office interview room.  Ranger Garcia showed to Jailer Garza jail observation logs for July 31, 2017 and August 1, 2017, and Jailer Garza said that she did not complete any of the entries on the logs.  She said that the person inside the "picket" was in charge of the logs, and that person was Sergeant Martinez on both days.  Jailer Garza said that she recognized the handwriting on the log for July 31, 2017, from 5:00 a.m. to 5:00 p.m., as being that of Sergeant Martinez.  Jailer Garza also recognized the initial entries on the log for July 31, 2017, from 5:00 p.m. to 6:00 p.m., as being made in the handwriting of Jailer Olivarez.

Finally, Jailer Garza recognized entries for the rest of the shift going into August 1, 2017 as being made in the handwriting of Jailer Hernandez.

### (5)      Beatrice Hernandez – Jailer (2 interviews)

51.      On August 1, 2017, at approximately 3:01 p.m., Investigator Gonzalez and Ranger Garcia interviewed Jailer Hernandez in the La Salle County Sheriff's Office interview room.  Jailer Hernandez said that she had been working as a jailer for the La Salle County Sheriff's Office jail for approximately 2 years and 2 months, and that she had worked as a jailer for the Frio County Sheriff's Office for approximately 5 years before that.  Jailer Hernandez said that she worked from 5:00 p.m. on July 31, 2017 to 5:00 a.m. on August 1, 2017, and that Jailer Olivarez worked with Jailer Hernandez from 5:00 p.m. to midnight on July 31, 2017.  Jailer Hernandez said, in addition to Mr. Davis, Mr. Bailey and Jared Ross Ramirez were housed in Holding Cell Number 2 on July 31, 2017.  Jailer Hernandez falsely said that she conducted inmate observations every 30 minutes for that cell and further checked on inmates in the cell every time she passed by.

52.      Jailer Hernandez said that she opened the door to Holding Cell Number 2 twice, because Mr. Davis was moaning and asking to see a doctor.  She also said that Sergeant Martinez told her that Mr. Davis was having withdrawal from drugs, so Jailer Hernandez told Mr. Davis, "You need to sweat out what you have," and then they could take him to see a doctor.  Thus, Jailer Hernandez ignored and was deliberately indifferent to Mr. Davis's serious medical needs and requests for immediate medical treatment.

53.      Jailer Hernandez testified that while she was working, she could hear Mr. Davis saying, "Ugh, ugh, oh my God, God help me."  Jailer Hernandez evidenced the fact that she knew that Mr. Davis would likely die, because she said hearing what was just described was how she knew that he was still alive.  Thus, upon information and belief, Jailer Hernandez expected Mr.

Davis to die and did nothing to obtain needed medical assistance. Jailer Hernandez also said that the jail had dealt with Mr. Davis in the past, and that the jail would call emergency medical services to transport him to the hospital. However, this time, Jailer Hernandez said that she made a decision not to contact EMS. She was able to call EMS and obtain needed emergency life-saving help for Mr. Davis, but she chose not to do so.

54.     Jailer Hernandez also said that she could hear Mr. Davis yelling, that he was hurting, sometime before midnight. She said that she also checked on Mr. Davis after Jailer Olivarez left. She said that Mr. Davis just kept yelling, "Oh God, oh God, please help me, oh God, please help me, it hurts, oh God!" When Jailer Hernandez would check on Mr. Davis after hearing such horrific yelling, he would just continue mumbling the same things. She said that between 12:00 a.m. and 5:00 a.m., Mr. Davis continued to moan and mumble. Jailer Hernandez did nothing.

55.     Jailer Hernandez said that Mr. Davis was still moaning and groaning at 5:00 a.m., when Jailer Garza and Sergeant Martinez arrived back at the jail. Ranger Garcia asked Jailer Hernandez for the jail's procedure for when an inmate in Mr. Davis's condition was incarcerated. She informed Ranger Garcia that such procedure was to provide an inmate with an orange, sugar, or bread and milk to get something on the person's stomach. Jailer Hernandez also said, in response to a question about whether the jail had a nurse on staff, that a doctor would visit the jail on Mondays. She also said that jail policy was to contact a supervisor regarding any medical issue, a doctor would then be notified, and a doctor would then determine whether EMS was needed. However, upon information and belief, that policy was not followed with regard to Mr. Davis.

56.     Jailer Hernandez said that Sergeant Martinez called the jail shortly after 10:00 p.m. that night. Jailer Hernandez said that she did not tell Sergeant Martinez anything about Mr. Davis, even though he was moaning and groaning just like earlier that day. Sergeant Martinez did not ask about Mr. Davis's condition when she called the jail that night, even though she was already

well-aware of Mr. Davis's serious medical needs.  This showed her deliberate indifference and objective unreasonableness as it related to Mr. Davis's life-saving needs.

57.     Jailer Hernandez agreed that someone going through withdrawal needed medical attention.  Upon information and belief, Jailer Hernandez learned this from training and/or experience.  Further, upon information and belief, all other natural person Defendants possessed the same knowledge, gained through their training and/or experience.  Jailer Hernandez, regardless of that knowledge, failed to provide and/or request medical attention for Mr. Davis.

58.     Jailer Hernandez said that Mr. Davis never stood up in the cell, and that he would only sit up when she spoke to him.  The fact that he never stood up was further evidence of his serious medical issues.  Jailer Hernandez also said that she did not think that anyone documented anything regarding Mr. Davis's moaning, or his request for medical assistance.  Upon information and belief, no one documented that information for at least two reasons.  First, people on staff did not want to be blamed for Mr. Davis's death.  Second, there was a widespread custom and/or practice of La Salle County jail employees, and thus of La Salle County, of not documenting such information in jail records.

59.     On November 13, 2017, Ranger Garcia called Jailer Hernandez and asked if she would voluntarily meet him at the La Salle County Sheriff's Office for follow-up questions regarding the investigation of Mr. Davis's death.  Jailer Hernandez agreed to do so, and she met Ranger Garcia at approximately 5:28 p.m. that day.  Ranger Garcia then conducted a second interview of Ms. Hernandez in the La Salle County Sheriff's Office interview room.

60.     Ranger Garcia told Ms. Hernandez that she was not under arrest, was free to leave, and could stop talking at any time.  Ms. Hernandez acknowledged the statement and indicated that she understood.  Ranger Garcia showed to Mr. Hernandez jail observation logs for Mr. Davis from July 31, 2017 and August 1, 2017.  Ms. Hernandez recognized the logs.  Ms. Hernandez indicated

that she recognized handwriting for the July 31, 2017 log beginning at 5:01 a.m. as being that of Sergeant Martinez.  She also indicated that she recognized signatures on the log as being those of Sergeant Martinez and Jailer Garza.

61.     Ms. Hernandez also indicated that she recognized signatures on the observation log for the July 31, 2017 night shift as being those of her and Jailer Olivarez.  Ms. Hernandez indicated that the first four entries from 5:00 p.m. to 6:00 p.m. looked like they were done in the handwriting of someone named "Macias."  Ranger Garcia informed Ms. Hernandez that the only two people working at the jail that night were Ms. Hernandez and Jailer Olivarez.  Ms. Hernandez stated that all the remaining entries from 7:30 p.m. to 5:00 a.m. were made by Ms. Hernandez.

62.     Ranger Garcia asked similar questions regarding the August 1, 2017 observation log.  Ms. Hernandez stated that all the entries on that log were made by Sergeant Martinez.  Ms. Hernandez indicated that jailers were supposed to conduct observations of inmates in holding cells every 30 minutes, but not beyond 1 hour.  Ms. Hernandez agreed, after it was pointed out by Ranger Garcia, that Ms. Hernandez's entries on observation logs were not accurate.  Ranger Garcia asked Ms. Hernandez why she made false entries in the log, and she indicated that all the jail staff did that because they were always busy up and down the hallway.  Upon information and belief, this assertion was true and evidenced La Salle County policy, practice, and/or custom – making false observation entries to cover up the fact that prisoners such as Mr. Davis were not being observed in accordance with jail standards and/or TCJS standards.

63.     Ms. Hernandez also said that Jail Administrator Ramirez told Ms. Hernandez that inmates complained about her when she went into cells to check on them.  Thus, Administrator Ramirez told Ms. Hernandez not to do that anymore, and not to touch inmates.  She also said that Sergeant Martinez told her that, as long as they indicated what they were doing on daily journals, that was enough to satisfy inmate observation requirements.

64.     Ms. Hernandez also admitted that jailers falsified observation logs for Mr. Davis for July 31, 2017 and August 1, 2017 because they had been told that all observations had to be made every 30 minutes, even if they did not check an inmate every 30 minutes.  Ms. Hernandez said that, if logs indicated more than 30 minutes had passed for a required observation, jailers had to go back and re-write logs to show observations were conducted every 30 minutes.  Ms. Hernandez said that Sergeant Martinez told Ms. Hernandez that she had to make sure that logs indicated that observations were done every 30 minutes, so that they would not get in trouble with the TCJS.  She also said that Sergeant Martinez was the one who reviewed the observation logs and would make jailers re-write them if they exceeded 30 minutes.  Upon information and belief, this also represented La Salle County policy, practice, and/or custom.

65.     Ms. Hernandez admitted to changing entries on an observation log to falsely indicate that observations had been made 30 minutes apart.  Ms. Hernandez also said that she had dealt with Mr. Davis on two prior occasions.  She said that he was released on both occasions so he could get medical attention.  Ms. Hernandez also admitted that, when he was released previously so that he could obtain medical attention, he was not even moaning and groaning like he was during the incarceration which lead to his death.  This made it clear that Ms. Hernandez and, upon information and belief, all other natural person Defendants, knew that Mr. Davis could be transported from the jail to a local hospital due to his clear and apparent need to obtain emergency medical treatment.  Ms. Hernandez also said that Sergeant Martinez called during the night when Mr. Davis was incarcerated, and they discussed where they were going to house Mr. Davis.

66.     Ms. Hernandez admitted that she did not conduct inmate observations of Holding Cell Number 2, where Mr. Davis was being held, at 1:30 a.m., 2:30 a.m., 3:00 a.m., 4:00 a.m., and 4:30 a.m. on August 1, 2017, even though she indicated that she had conducted such observations. She also admitted other facts related to falsification of observation records regarding Mr. Davis.

67.     Ms. Hernandez admitted to Ranger Garcia that she knew that it was a crime to falsify logs.  However, she stated that Sergeant Martinez was the one who told her to falsify observation logs so that the jail would not get into trouble with the TCJS.  Sergeant Martinez said that, if the jail got into trouble, it could be shut down.  Upon information and belief, this was further evidence of a policy, practice, and/or custom of the La Salle County jail, and thus of La Salle County, to falsify records regarding prisoner observations.  Thus, upon information and belief, this policy, practice, and/or custom, and others referenced in this pleading, was in place not to comply with TCJS and other legal standards, and to protect pre-trial detainees such as Mr. Davis, but instead to ensure that all jail staff, including natural person Defendants, were able to keep their jobs.

<u>(6)     Denise Jimenez – Dispatcher/Jailer</u>

68.     On November 13, 2017, at approximately 4:58 p.m., Ranger Garcia interviewed La Salle County's Sheriff's Office Dispatcher/Jailer Denise Jimenez in the La Salle County Sheriff's Office interview room.  Dispatcher/Jailer Jimenez said that she had been employed with the La Salle County Sheriff's office for over 4 years.  She said that she started hearing "moaning noises" after Mr. Davis was brought into the jail on July 31, 2017, but that she thought it was a different inmate in the same cell.  She also recalled that, on one occasion, when the door to Holding Cell Number 2 was opened, she could hear someone cursing in the background.  She thought it was an inmate other than Mr. Davis – one who had been arrested in Encinal.  Dispatcher/Jailer Jimenez said that she could hear the same noises when she arrived at work on August 1, 2017, but that she did not know it was Mr. Davis making noises.  She remembered someone stating "shut up" during the briefing on August 1, 2017.  Upon information and belief, she was referring to a jailer making such a statement.

69.     Dispatcher/Jailer Jimenez said that she believed Dispatcher/Jailer Murray told her that Mr. Davis had requested EMS, and that Jailer Hernandez said that Mr. Davis was "just withdrawing." However, she was not certain exactly what she was told. Dispatcher/Jailer Jimenez also said that she had seen Mr. Davis in the jail before, but that he had never moaned like that before. Upon information and belief, the assertion that he had never moaned like that before was false. Dispatcher/Jailer Jimenez said that jailers had authority to call for EMS if they believed an inmate needed medical attention.

### (7)     Joshua Reyes Martinez – Jailer

70.     On November 13, 2017, at approximately 4:37 p.m., Ranger Garcia interviewed La Salle County Sheriff's Office Jailer Joshua Reyes Martinez in the La Salle County Sheriff's Office interview room. Ranger Garcia told Jailer Martinez that Jailer Garza believed that Jailer Martinez was in training during the week of Mr. Davis's death. However, Ranger Garcia told Jailer Martinez that Ranger Garcia reviewed video from the jail and saw Jailer Martinez inside the control room when Mr. Davis was in custody. Jailer Martinez said that he did not remember anything.

71.     Ranger Garcia asked Jailer Martinez if he knew of Mr. Davis's death and, if so, how he found out. Jailer Martinez said that he believed that Sergeant Martinez told him about Mr. Davis's death, because she felt bad about what happened. Jailer Martinez also said that he had begun working for the La Salle County jail some time between June 15, 2017 and June 30, 2017.

72.     Ranger Garcia displayed relevant observation logs to Jailer Martinez and asked him if someone explained to him, when he was hired, how to complete them. Jailer Martinez was familiar with the logs and said that he had completed some in the past. Ranger Garcia asked Jailer Martinez if he was supposed to complete the logs with the exact time he conducted observations, or if he completed them on the hour and half-hour. Jailer Martinez said that he completed logs

with times within 5 minutes of actual observations.  Ranger Garcia asked Jailer Martinez if he knew that falsifying information on the logs was a crime.  Jailer Martinez said that no one explained that to him.  However, Jailer Martinez admitted that he had falsified observation logs a few times in the past when he first started working at the La Salle County jail.  Jailer Martinez also admitted that he had gone 45 minutes to an hour over the 30-minute observation requirement.  This was further evidence of policy, practice, and/or custom of La Salle County of not making prisoner observations when required and further falsifying records regarding actual observations.

### (8)    Yvette Martinez – Sergeant/Jailer (3 Interviews)

73.    On August 1, 2017, at approximately 12:05 p.m., La Salle County Sheriff's Office Investigator Gonzalez and Ranger Garcia interviewed Sergeant Martinez in the La Salle County Sheriff's Office interview room.  Sergeant Martinez said that she had been employed as a sergeant for the La Salle County Sheriff's Office since October 2016.  She also said that she had 14 years experience in the jail division. Sergeant Martinez said that she had a total of 17 years experience in "public service."

74.    Sergeant Martinez said that she worked on July 31, 2017 from 5:00 a.m. to 5:00 p.m., and that Mr. Davis arrived at the jail that day at approximately 2:20 p.m.  Sergeant Martinez said that she, Jailer Garza, and Jailer Aguilar worked on July 31, 2017 from 5:00 a.m. to 5:00 p.m. She also said that Jailer Aguilar worked in the kitchen.  Sergeant Martinez said that there were 28 inmates, including Mr. Davis, in the La Salle County jail.  She also said that Mr. Davis was placed into Holding Cell Number 2, with Jared Ross Ramirez, Mr. Bailey, and Augustine Nathaniel Ortiz. Sergeant Martinez said that Mr. Ramirez and Mr. Ortiz were Hispanic, and Mr. Bailey was African-American.  Sergeant Martinez also said that an inmate known as "Havis" was in that cell with the other inmates for a very short period of time.  She said that Havis was mentally unstable.

She also said that Mr. Ramirez was placed in a non-holding cell because she knew that he was going to be staying longer due to a commitment for criminal non-support.

75.     Sergeant Martinez said that she spoke to jail staff that night, and they asked her what to do with Mr. Davis.  This showed that Sergeant Martinez believed that she was in charge and could direct other jail staff as to what to do regarding Mr. Davis.  Sergeant Martinez said that she told them to have him eat and rest, and he would be evaluated in the morning.  She said that she went to work in the morning, which would have been August 1, 2017, and that Mr. Davis was moaning.  Sergeant Martinez said that they were aware that he was HIV-positive.  She also said that it was difficult to be checking on him all the time.  Regardless, such alleged difficulty did not excuse Sergeant Martinez's or any other natural person Defendant's obligation to comply with the Constitution when dealing with Mr. Davis.  Sergeant Martinez also said that Mr. Davis appeared to be weaker than usual.  This was further evidence that Sergeant Martinez knew that Mr. Davis needed emergency medical treatment, rather than being left in a cell overnight to die.  Sergeant Martinez then attempted to minimize what she knew about Mr. Davis's horrific condition, which led to his death, talking about him being in allegedly "good spirits" when he arrived at the jail.

76.     Sergeant Martinez said that she heard Mr. Davis moaning when she arrived at work on August 1, 2017, and asked the jailer what it was.  Sergeant Martinez said that the jailer told her it was Mr. Davis.  Sergeant Martinez also said that, after she started working that day, she heard Mr. Bailey on the intercom saying that he did not think that Mr. Davis was breathing.  Sergeant Martinez said that she had someone request emergency medical services, and as soon as she opened the cell door, she saw Mr. Davis and initiated CPR by doing chest compressions.  Sergeant Martinez said that Mr. Davis did not have a pulse before she initiated CPR, and that his body was cold.  Sergeant Martinez also said that jail staff indicated to her that Mr. Davis had never requested medical assistance through the night.  This was false.

77.     Sergeant Martinez also said that she, Jailer Garza, and Jailer Aguilar came to work at 5:00 a.m. on August 1, 2017, and that Jailer Hernandez worked from 5:00 p.m. on July 31, 2017 to 5:00 a.m. on August 1, 2017.  She also said Jailer Olivarez worked from 5:00 p.m. to 12:00 a.m. on July 31, 2017, and that Jailer Hernandez worked – alone – from 12:00 a.m. to 5:00 a.m. on August 1, 2017.

78.     Sergeant Martinez alleged that Mr. Davis did not ask for medical assistance and did not complain of any illness or pain while Sergeant Martinez was there on July 31, 2017.  This was false.  Sergeant Martinez alleged that she had dealt with Mr. Davis on two prior occasions, and that he was not acting any different on this occasion.  Upon information and belief, this was false. Sergeant Martinez also said that Mr. Davis was usually under the influence of narcotics when he arrived at the jail, and she described withdrawal symptoms as shakes, chills, agitation, cold sweats, vomiting, dizzy spells, light headedness, and fever.  Sergeant Martinez admitted that Mr. Davis vomited just before she left work on July 31, 2017.  Sergeant Martinez also admitted that she called the jail on the night of July 31, 2017, and allegedly asked Jailer Hernandez how Mr. Davis was doing.  This is evidence that Sergeant Martinez knew that Mr. Davis needed immediate medical treatment, but instead of obtaining it, she chose to go home and merely place a phone call to the jail later.  Thus, she was deliberately indifferent to his serious medical needs and acted in an objectively unreasonable manner.

79.     On August 1, 2017, at approximately 4:30 p.m., Investigator Gonzalez and Ranger Garcia re-interviewed Sergeant Martinez in the same interview room.  Investigator Gonzalez and Ranger Garcia had requested jail observation logs from Sergeant Martinez.  Sergeant Martinez provided the logs for July 31, 2017, from 5:00 a.m. to 5:00 p.m., and for July 31, 2017 from 5:00 p.m. to 5:00 a.m. on August 1, 2017.

80.     Ranger Garcia asked Sergeant Martinez what the jail policy stated regarding inmates who requested medical assistance.  Sergeant Martinez stated that they normally contact the doctor under contract and, if it was an emergency, jailers would automatically request emergency medical services. Sergeant Martinez said that there was not a nurse on staff at the jail, and that the doctor under contract visited the jail once each week (but at times only once every other week).  Sergeant Martinez also said that, for emergencies, the on-duty jailer would make the decision to contact EMS.  For other related medical issues, Sergeant Martinez would make the decision as to whether jailers needed to contact EMS.

81.     Sergeant Martinez said that she spoke to Jailer Hernandez on the night of July 31, 2017, and she told her she had not booked Mr. Davis into the jail yet, because he did not want to get up and get fingerprinted.  This was a clear violation of TCJS standards.

82.     Sergeant Martinez admitted that, when Mr. Davis was incarcerated on a prior occasion, arrangements were made to release him from custody when he requested medical treatment.  This showed that Sergeant Martinez was fully aware that she, or any natural person Defendant, could have obtained needed emergency medical treatment for Mr. Davis without any problem.

83.     On November 14, 2017, at approximately 3:21 p.m., Sergeant Martinez met Ranger Garcia at the La Salle County Sheriff's Office interview room for Sergeant Martinez's third interview regarding Mr. Davis's death.  Ranger Garcia told Sergeant Martinez that she was not under arrest, was free to leave, and could stop talking to him at any time.  Sergeant Martinez indicated that she understood.  Ranger Garcia asked Sergeant Martinez whether she was directed by Jail Administrator Ramirez to keep Mr. Davis in the jail, so that he could go through withdrawals.  Sergeant Martinez denied being given such an instruction.

84.     Ranger Garcia displayed the observation log for July 31, 2017, morning shift, to Sergeant Martinez.  Sergeant Martinez confirmed that the signatures on the log were hers and Jailer Garza's.  Sergeant Martinez confirmed that she documented all of the observation times on that log.  Ranger Garcia then displayed the observation log for July 31, 2017, night shift, and asked Sergeant Martinez to identify handwriting on the top portion of the log.  Sergeant Martinez said that the upper entries were made by Jailer Olivarez, and that from 7:30 p.m. following, the handwriting was of former Jailer Hernandez.

85.     Ranger Garcia then displayed the observation log for August 1, 2017, morning shift, and asked who documented observations that day.  Sergeant Martinez said that she documented all observations on that log.  Ranger Garcia told Sergeant Martinez that he was aware that the times on the observation logs were not actual times.  Sergeant Martinez agreed.  Sergeant Martinez said that not all jail staff documented observations on the hour and half-hour.

86.     Sergeant Martinez said that the daily journal had all information regarding the shift, including observations.  Ranger Garcia told Sergeant Martinez that Ms. Hernandez had admitted that she conducted inmate observations at intervals beyond one hour.  Sergeant Martinez said there was no reason for that to occur, especially during the night shift.  Ranger Garcia told Sergeant Martinez that Ms. Hernandez stated that Sergeant Martinez was the one who told Ms. Hernandez to document the 30-minute observations – even if they did not occur.  Sergeant Martinez denied the allegation.  Ranger Garcia told Sergeant Martinez that Ms. Hernandez said that Sergeant Martinez would review the observation logs, and if some entries were beyond the 30-minute interval, she would make other jailers correct them.  Sergeant Martinez denied the allegation and said that she reviewed observation logs on the daily journal, and if they did not match, she would correct the logs.

87.     Ranger Garcia told Sergeant Martinez that Sergeant Martinez had documented inmate observations on August 1, 2017 for several cells, even though she had never left the control room.  Sergeant Martinez admitted she falsified the log and did not conduct those observations.  Sergeant Martinez admitted that they "made some mistakes" and said, "She should have called me, I should have made sure he went to the hospital, and regardless of whether he was withdrawing or he wasn't."  Thus, Sergeant Martinez knew that she had acted in a deliberately indifferent manner and knew that she had acted unreasonably regarding Mr. Davis.  Sergeant Martinez said that the jail was shorthanded, and that they needed more staff to be able to complete their duties.

### (9)     Sarah Elizabeth Murray – Dispatcher/Jailer

88.     On August 1, 2017, at approximately 4:01 p.m., Investigator Gonzalez and Ranger Garcia interviewed Dispatcher/Jailer Sarah Elizabeth Murray in the La Salle County Sheriff's Office interview room.  Dispatcher/Jailer Murray said that she had been employed with the La Salle County Sheriff's Office since April 2016, and that she had worked from 5:00 p.m. on July 31, 2017 to 5:00 a.m. on August 1, 2017.

89.     Dispatcher/Jailer Murray said that she learned that Mr. Davis was in the jail when she arrived at work at approximately 5:00 p.m.  She alleged that she had heard that Mr. Davis had been "cleared" earlier by emergency medical services personnel.  However, regardless of what Dispatcher Murray had allegedly heard, what she observed and heard after arriving at work should have resulted in her taking immediate action to save Mr. Davis's life.  What she heard and what she observed made it clear and apparent to her that Mr. Davis needed emergency medical treatment.

90.     Dispatcher/Jailer Murray said that Mr. Davis was being housed in Holding Cell Number 2.  Dispatcher/Jailer Murray remembered that Mr. Davis was knocking on the window

and wanted a towel at one point during the evening.  She also said that Mr. Davis was not standing up when he was knocking on the window, and that she would hear Mr. Davis moaning on and off throughout the night.

91.     Dispatcher/Jailer Murray said that she answered the intercom one time that night, and that Mr. Davis said he needed help.  Therefore, Dispatcher/Jailer Murray said that she told Jailer Hernandez.  Dispatcher/Jailer Murray said that she believed Mr. Davis was going to be put on a list to see a doctor on August 1, 2017.  She also said that Sergeant Martinez called the jail at around 10:00 p.m. on July 31, 2017 to see how things were going.  Dispatcher/Jailer Murray recalled that Jailer Olivarez worked until midnight on July 31, 2017.

92.     Dispatcher/Jailer Murray said that she had seen a female inmate go through withdrawals in the past, and that female inmate was hallucinating and complaining that she was ill.  Dispatcher Murray said that she did not know what to do for someone who was going through withdrawals.   Upon information and belief, based upon her education and experience, that allegation was false.  Upon information and belief, Dispatcher/Jailer Murray knew that Mr. Davis needed emergency medical treatment, or he risked an excruciating death.

### (10)     Anna Marie Olivarez – Jailer

93.     On August 1, 2017, at approximately 2:15 p.m., Investigator Gonzalez and Ranger Garcia interviewed Jailer Anna Marie Olivarez in the La Salle County Sheriff's Office interview room.  Jailer Olivarez said that she had been employed with the La Salle County Sheriff's Office jail since 2007.  She also said that she had worked from 5:00 p.m. to midnight on July 31, 2017, and that she had worked that day with Jailer Hernandez.

94.     Jailer Olivarez believed that five different people were brought to the jail on July 31, 2017 – Jared Ross Ramirez (an Hispanic male), Mr. Davis (a white male), and Mr. Bailey (a

black male) were in Holding Cell Number 2. Augustin Nathaniel Ortiz (an Hispanic male) was later placed into the cell with them.

95.     Jailer Olivarez said that she had dealt with Mr. Davis on two prior occasions, and that she was always told that he was detoxing when he came in. Jailer Olivarez said that they would usually not book Mr. Davis into the jail until the day after he arrived, because of the condition in which he was at time of arrival. Jailer Olivarez said that she conducted visual observation checks during her shift, and that she actually checked on Mr. Davis during those observations. She said that she heard someone moaning when she first got to work on July 31, 2017 and noticed that Mr. Davis was lying on a mattress on the floor. Jailer Olivarez admitted that she knew that Mr. Davis was detoxing. She also admitted that Mr. Davis vomited water and juice which were given to him. She said that Mr. Davis stopped moaning and kept saying that he was very cold. Jailer Olivarez said that she was constantly going into and out of Holding Cell Number 2, because they were booking in other inmates. Jailer Olivarez said that Mr. Davis thanked her when she gave him a blanket, and that he appeared to be fine after that. This was false.

### (11)    Augustine Nathanial Ortiz – Prisoner

96.     On August 1, 2017, at approximately 10:08 a.m., Investigator Gonzalez and Ranger Garcia interviewed Augustine Nathanial Ortiz in the La Salle County Sheriff's Office interview room. Mr. Ortiz said that he was arrested and incarcerated in the La Salle County Jail on July 31, 2017 at approximately 6:30 p.m. Mr. Ortiz said that he was placed into the same cell as Mr. Davis. He also said that he heard that Mr. Davis was referred to as "Country." He said that Mr. Davis, an Hispanic male, and a black male were in the same cell with Mr. Ortiz. Mr. Ortiz said that the Hispanic male was moved out of the cell at some point during the night. He also said that Mr. Davis was moaning very loudly and asking, "Please help me." Upon information and belief, all

natural person Defendants heard Mr. Davis moaning, groaning, asking for help, asking for medical care, and/or crying out as if he would die. He also said that Mr. Davis said that he needed help and was in pain.

97.     Mr. Ortiz said that at one point Mr. Davis took one bite of food and then started rolling all over the floor. Mr. Ortiz said that, between approximately 2:00 a.m. and 4:00 a.m., Mr. Davis started screaming and hollering. Upon information and belief, the natural person Defendants working at the jail at that time heard Mr. Davis screaming and hollering. Mr. Ortiz also said that, at approximately 6:00 a.m., the black male prisoner started telling Mr. Davis to wake up and further said that something was wrong. The prisoner also said that Mr. Davis did not appear to be breathing. Mr. Ortiz said he looked at Mr. Davis and noticed that he was not breathing. He then asked jail staff for help, because it looked like Mr. Davis was deceased.

98.     Mr. Ortiz also said that Mr. Davis's eyes were rolled back into his head, and that he looked very pale. Mr. Ortiz said that Mr. Davis never got up throughout the time he was in the cell with him, but kept saying that he needed help and that he did not want to die. Upon information and belief, all natural person Defendants knew that Mr. Davis, by not getting up off the floor, was seriously ill and needed immediate emergency medical treatment. Mr. Ortiz said that the black male prisoner told jail staff, approximately twice, that Mr. Davis needed help. Jail staff's response was that Mr. Davis was okay. Mr. Ortiz also said that jail staff never checked on Mr. Davis despite his fellow prisoners' attempts to get him help. Mr. Ortiz recalled that Mr. Davis had been yelling really loudly that night.

### (12)     Dorothy "Dottie" Ramirez – Jail Administrator

99.     On August 1, 2017, at approximately 4:53 p.m., Investigator Gonzalez and Ranger Garcia Interviewed La Salle County Sheriff's Office Jail Administrator Dorothy "Dottie" Marie Ramirez in the La Salle County Sheriff's Office interview room. Ranger Garcia had requested the

relevant La Salle County Sheriff's Office jail daily journal, and Administrator Ramirez provided a copy to him for July 31, 2017 and August 1, 2017.  Administrator Ramirez also provided to Ranger Garcia other documents related to Mr. Davis.

100.    Administrator Ramirez said that she had been the jail's administrator for approximately two years.  She said that she had dealt with Mr. Davis in the past, and that he allegedly was always sweating and looked like he was under the influence of drugs.  She said that she saw Mr. Davis when he was initially incarcerated in the jail on July 31, 2017.  However, upon information and belief, Mr. Davis looked much sicker during the relevant incarceration than he had previously.  Thus, upon information and belief, Administrator Ramirez knew that she should have obtained emergency medical treatment for Mr. Davis.

101.    Administrator Ramirez said that Mr. Davis was very thirsty, and sweating, and drank 2 cups of water that Sergeant Galvan gave to him.  She also said that Mr. Davis believed that he was dehydrated.  Administrator Ramirez remembered that jail staff had requested EMS one time for Mr. Davis in the past due to an injury to his hand.  Jail Administrator Ramirez also said that, if an inmate was moaning in pain, jail staff should request EMS to check on the prisoner.  She also said that jailers had the option to contact the County–contracted doctor and ask him for a medical opinion if they had a question regarding an ill prisoner.

102.    After reviewing the daily journal, Ranger Garcia noted that the only time Mr. Davis was mentioned was when he was brought into the jail at 2:10 p.m. on July 31, 2017.  There were no other entries regarding Mr. Davis.

103.    Administrator Ramirez said that the first telephone call she received from the jail regarding Mr. Davis was on August 1, 2017 at approximately 6:30 a.m.  She also said that jail staff should have called her to inform her of Mr. Davis's condition before that time.  Administrator Ramirez said that the jail did not have a written policy regarding when to seek medical treatment

for inmates.  Thus, Administrator Ramirez was stating the policy, practice, and/or custom of La Salle County, regardless of any written policies which may be produced.  Administrator Ramirez also said that the jail did not have a nurse on staff.  She also said that jailers had the option of placing a medical observation on an inmate, which would result in the inmate being placed near the front of the jail by staff and checked every 15 minutes.  She also said that, in such a case, jail staff should note observations on a medical observation log.  Finally, she said that such 15-minute observations could be done only for a medical issue or a suicide watch.

104.    Administrator Ramirez admitted that 15-minute observations would have been a good option for Mr. Davis, and that Sergeant Martinez would have been the one to implement such observations.  Administrator Ramirez said that she made a sandwich for Mr. Davis because he said that he was hungry.  She also said that she left the jail between 5:00 p.m. and 5:30 p.m. on July 31, 2017.  Administrator Ramirez said that she did not recommend giving sugar or bread to someone who was going through withdrawals.

105.    Administrator Ramirez said that Jailer Aguilar went to Administrator Ramirez's house on August 1, 2017, some time between 6:30 a.m. and 7:00 a.m., and told her that an inmate had passed away in the jail.  Administrator Ramirez said that she had her telephone on vibrate and had therefore missed some telephone calls.

106.    Administrator Ramirez said that she went to the control room on the morning of August 1, 2017 and asked Sergeant Martinez, Jailer Agular, and Jailer Garza what happened.  She said that Sergeant Martinez told her that someone from Holding Cell Number 2 called the jailers, and that she had performed CPR on Mr. Davis.  Administrator Ramirez also said that Sergeant Martinez told her that Jailer Hernandez told them that Mr. Davis had been fine and was snoring all night.  This was clearly false.

<u>(13)      Jared Ross Ramirez – Prisoner</u>

107.      On August 1, 2017, at approximately 11:13 a.m., Investigator Gonzalez and Ranger Garcia interviewed Jared Ross Ramirez.  Mr. Ramirez said that he arrived at the La Salle County Jail at approximately 2:30 p.m. on July 31, 2017, as a prisoner, and was placed into the holding cell with Ransley Dontrell Bailey, a black male, Mr. Davis, a white male, and a white male prisoner whom he did not know.  Mr. Ramirez said another male prisoner was placed into the cell at around 7:00 p.m.  He also said that the white male prisoner was moved out of the cell approximately one hour after he was placed into the cell.  Mr. Ramirez said that Mr. Davis was lying down the entire time that he was in the cell.  He also complained that he was sick, and he was yelling.  Mr. Ramirez said that Mr. Davis kept saying that he needed to go to the hospital and needed to see a doctor.  Thus, contrary to assertions made by Administrator Ramirez, Mr. Davis continually sought medical treatment.  Upon information and belief, natural person Defendants who were in the jail when Mr. Davis complained he was sick, was yelling, and complained about needing to see a doctor heard it.

108.      Mr. Ramirez said that Mr. Davis said that he was having withdrawals from "Ice." "Ice" is a slang term for a form of methamphetamine.  Mr. Ramirez said that he activated the intercom for Mr. Davis, so that he could ask for help.  He also said that Mr. Davis vomited onto the floor at one point.  Mr. Ramirez said that the vomit was red and looked like "Kool-Aid."  Mr. Ramirez said that Mr. Davis attempted to eat, could not do so and looked like he was still under the influence of narcotics.

109.      Mr. Ramirez said that Mr. Davis kept saying, "Jesus, Jesus."  Further, Mr. Ramirez said that, even though it was really cold in the cell, Mr. Davis was sweating profusely.  Upon information and belief, everyone who interacted with Mr. Davis on July 31, 2017 and August 1, 2017 (including the natural person Defendants) also observed this.

110.    Mr. Ramirez said that jail staff only provided Mr. Davis with water and Ibuprofen. He also said that jail staff were allegedly busy with other prisoners that night.  This was further evidence of the natural person Defendants' deliberate indifference.

111.    Finally, Mr. Ramirez said that Mr. Davis was not acting normally and was saying "crazy" things.  He also said that jail staff told Mr. Davis that they could not take him to see a doctor until August 1, 2017.  Unfortunately, this was too late for Mr. Davis.  He needed emergency medical treatment on July 31, 2017.  If he would have received it, he would have lived.

<u>c.      La Salle County Jail Records</u>

112.    The La Salle County jail keeps a daily journal, listing certain events which occur in the jail.  The journal is a pre-printed form on which, at least at the time Mr. Davis was incarcerated, written notes are made.  Moreover, journal pages have handwritten on them dates covered by the pages, the period of time (with a beginning of time and a concluding time), and names of jailers on duty.  All of this information is handwritten.  The portion of the journal form which references jailers on duty also reads that jailers are to be referenced by their signatures (as opposed to someone other than a specific jailer writing the name of that jailer).  The following table provides certain information in daily journals obtained through Public Information Act requests.  Each row in the table contains information extracted from a single page in La Salle County jail's daily journal.

| Date | Time Period | Apparent Jailers on Duty Based on Purported Signatures | Comments |
|------|-------------|--------------------------------------------------------|----------|
| 07/31/17 | 5:00 a.m. to 10:30 a.m. | Y. Martinez<br>F. Garza<br>M. Aguilar | |
| 07/31/17 | 10:30 a.m. to 12:45 p.m. | Y. Martinez<br>M. Aguilar<br>F.  Garza | |
| 12:40 p.m. to 12:45 p.m. – time overlap | | | |

| Date | Time Period | Apparent Jailers on Duty Based on Purported Signatures | Comments |
|---|---|---|---|
| 07/31/17 | 12:40 p.m. to  5:00 p.m. | Y. Martinez<br>M. Aguilar<br>F.  Garza | Mr. Davis brought into jail at 2:10 p.m. |
| 07/31/17 | 5:00 p.m. to  9:48 p.m. | B. Hernandez<br>C.M. Olivarez | |
| 9:49 p.m. to  9:54 p.m. – no page provided ||||
| 07/31/17 | 9:55 p.m. to  3:50 a.m. | Unknown | |
| 3:50 a.m. to  4:30 a.m. – no page provided ||||
| 08/01/17 | 4:30 a.m. to  4:50 a.m. | Unknown | |
| 4:50 a.m. to  5:00 a.m. – no page provided ||||
| 08/01/17 | 5:00 a.m. to  7:38 a.m. | Y. Martinez<br>F. Garza<br>M. Aguilar | |
| 08/01/17 | 7:37 a.m. to  9:30 a.m. | F. Garza<br>M. Aguilar<br>Y. Martinez | |
| 9:31 a.m. to  9:34 a.m. – no page provided ||||
| 08/01/17 | 9:35 a.m. to  1:25 p.m. | Y. Martinez<br>F. Garza<br>M. Aguilar | |
| 1:26 p.m. to  1:34 p.m. – no page provided ||||
| 08/01/17 | 1:35 p.m. to _____ | Y. Martinez<br>F. Garza<br>M. Aguilar | |
| 08/01/17 | 5:00 p.m. to _____ | Y. Martinez<br>F. Garza<br>C. Gonzalez<br>B. Hernandez | |
| 5:00 p.m. to 9:20 p.m. – time overlap ||||
| 08/01/17 | 5:00 p.m. to  9:20 p.m. | Y. Martinez<br>F. Garza<br>C. Gonzalez<br>B. Hernandez | |
| 9:21 p.m. to 9:24 p.m. – no page provided ||||
| 08/01/17 | 9:25 p.m. to _____ | B. Hernandez<br>C. Gonzalez | |
| 08/02/17 | 2:30 a.m. to _____ | B. Hernandez<br>C. Gonzalez | |
| 08/02/17 | 4:45 a.m. to  7:30 a.m. | K. Bevel<br>G. Rodriguez | |
| 7:31 a.m. to  7:49 a.m. – no page provided ||||
| 08/02/17 | 7:50 a.m. to 10:50 a.m. | G. Rodriguez<br>K. Bevel | |

| Date | Time Period | Apparent Jailers on Duty Based on Purported Signatures | Comments |
|---|---|---|---|
| 10:51 a.m. to 10:59 a.m. – no page provided | | | |
| 08/02/17 | 11:00 a.m. to   1:10 p.m. | G. Rodriguez K. Bevel | |
| 08/02/17 | 1:10 p.m. to   3:00 p.m. | K. Bevel G. Rodriguez | |
| 3:01 p.m. to   3:29 p.m. – no page provided | | | |
| 08/02/17 | 3:30 p.m. to _____ | Y. Martinez | |

113.     All jailers on duty during the relevant time period were fully aware that, if they ignored prisoners under their care, prisoners could die from several known causes.  For example, on July 31, 2017, at 11:53 a.m., when Ms. Martinez, M. Aguilar, and F. Garza were on duty, prisoner Maldonado attempted to commit suicide.  Apparently, prisoner Maldonado used a string in an attempt to die from strangulation.  EMS were ultimately called to the scene, and prisoner Maldonado was placed into a restraint chair.

114.     A journal entry indicates that Mr. Davis was brought into the jail on July 31, 2017 at 2:10 p.m., at a time when jailers on duty were Sergeant Martinez, Jailer Garza, and Jailer Aguilar.  Upon information and belief, the daily journal page listing Mr. Davis's arrival was not signed by all three such persons, but instead a single jailer wrote all three names.  There is no further entry referencing Mr. Davis in the daily journal until 6:25 a.m. on August 1, 2017, despite the fact that Mr. Davis obviously and visibly needed medical attention long before that time.  The entry reads "inmate in holding 2/2 [sic?] states inmate does not look like he[']s breathing."  An entry purportedly made one minute later – at 6:26 a.m. – indicates that EMS was paged and CPR was started by Ms. Martinez.  According to the journal, EMS personnel arrived in the unit at 6:36 a.m.  Moreover, according to the journal, EMS personnel relieved Ms. Martinez from conducting CPR at approximately 6:38 a.m.  Further, according to the journal, at 6:57 a.m., per a Dr. Roth, EMS was advised to stop conducting CPR.  The journal then indicates that D. Ramirez was called,

as well as a captain and the Texas Rangers.  This occurred as a result of Mr. Davis's death.[1]  Thus, when reading the journal, it appears that Mr. Davis had no physical issues before jailers were notified that he did not look like he was breathing – at 6:25 a.m. on August 1, 2017.  Unfortunately, this is not the truth.

115.    Mr. Davis was kept, upon information and belief, in a holding cell in front of the control area in which jailers had their office.  According to Jail Administrator Dorothy Ramirez, who responded on behalf of La Salle County to the TCJS investigation of Mr. Davis's death, the La Salle County jail did not have medical staff available to address any medical issues documented at the time a person such as Mr. Davis is booked-in.

116.    On December 29, 2017, Captain Jose Garcia with the La Salle County Sheriff's Office wrote an email to inspector Wendy Wisneski with the TCJS.  Captain Garcia acknowledged that the jail had not been in compliance with TCJS standards, and had outlined a corrective plan of action to become compliant.  Captain Garcia also noted that two jailers were fired and arrested as a result of the investigation regarding Mr. Davis's death.

### 3.    Violation of La Salle County Written Policies

117.    La Salle County produced, in response to a Public Information Act request before this lawsuit was filed, a document entitled, "La Salle County Jail Health Services Plan."  The objective reads, "The objective of the Health Services Plan is to provide medical, dental, and mental health services for inmates on a 24 hour basis while confined in the La Salle County jail."

---

[1]   The journal indicates that EMS personnel left the unit at 7:25 a.m. on August 1. 2017.  The journal also indicates that an investigating Texas Ranger arrived at the jail at 7:30 a.m. to examine Mr. Davis and take photographs.  The journal indicates that the investigating Texas Ranger was taking photographs in holding cell number 2 at 7:37 a.m.  Sergeant Martinez cleaned holding cell number 2, according to the journal, at 8:30 a.m.  Jailer Hernandez and Jailer Garza removed trash from the facility at 8:50 a.m.  Upon information and belief, they may have been spoliating, or disposing of, evidence related to Mr. Davis's death.

However, upon information and belief, this was a false objective and did not reflect what was actually occurring at the jail. La Salle County did not provide medical, dental, and/or mental health services for pre-trial detainees and other prisoners on a 24-hour basis while confined in the La Salle County jail. Instead, healthcare services were provided as described elsewhere in this pleading – an occasional visit by a doctor (approximately every one-to-two-weeks). However, the document indicates that emergency medical service was available around the clock through use of ambulances, emergency medical technicians, and paramedics.

118. Further, the policy reads, "If it becomes necessary to transport an inmate to the Emergency Room, Emergency Medical Service personnel will be accompanied by an officer to assure their safety and to secure the inmate until returned to the Detention Center." Thus, the natural person Defendants could have simply called for a paramedic and/or other EMT to obtain needed emergency medical treatment for Mr. Davis.

119. Moreover, if a prisoner refuses to accept medical or surgical examination, such "will be documented and placed in the inmate's medical file." Upon information and belief, no such true refusal was documented regarding Mr. Davis for his July 31, 2017 to August 1, 2017 incarceration. Further, the policy reads, "Continued refusal will be forwarded to the medical staff and the Jail Administrator." Regardless, there was no refusal, and thus no continued refusal, by Mr. Davis at the La Salle County jail to receive needed life-saving medical treatment. Quite the contrary, Mr. Davis begged for such treatment.

120. La Salle County also produced a document entitled "La Salle County Jail Mental Disabilities/Suicide Prevention Plan." One provision in that plan reads, "Upon booking, each inmate shall be screened utilizing the Suicide and Medical and Mental Impairments form prior to admitting an inmate into the La Salle County Jail." Further, a provision reads, "For inmates who are severely intoxicated, after a minimum detoxification time (approximately 4 hours), intoxicated

inmates will be re-evaluated and the suicide and medical and mental impairments form completed." This policy was implemented with deliberate indifference to the certain result of severally intoxicated prisoners – death. The policy also requires any inmate refusing to participate in the screening process to sign the screening form indicating refusal. Further, the policy requires additional attempts to be made, and then notations made on the form, of further attempts to obtain intake information from a prisoner. Despite these policies, upon information and belief, it was La Salle County custom, practice, and policy to not conduct intake of people who were in the same condition as Mr. Davis.

D.      Post-Death Reports

1.      Death Certificate and Autopsy

121.    The death certificate for Mr. Davis indicated that he was "found August 1, 2017." The immediate cause of death was listed as drug overdose, and the section answering the question as to how the injury occurrence occurred read, "Methamphetamine overdose." The document was electronically filed with the La Salle County Clerk, and it was electronically signed by Justice of the Peace George Trigo of Cotulla.

122.    Doctor Corinne E. Stern performed an autopsy. Dr. Stern's opinion was that Mr. David "died from a methamphetamine overdose." As pathologic diagnoses, Dr. Stern listed methamphetamine toxicity and mild dehydration. A toxicology report was consistent with Dr. Stern's determination.

2.      La Salle County

123.    On August 1, 2017, at approximately 3:19 p.m. Jackie Benningfield, with the Texas Commission on Jail Standards ("TCJS") sent an email to Chief Ramirez with the La Salle County

Sheriff's Department.  Ms. Benningfield asked Ms. Ramirez to complete a Standard Inmate Death Reporting form used by the TCJS.

124.    The form indicated that it was completed by Jail Administrator Dorothy Ramirez at 3:00 p.m. on August 1, 2017.  It listed the La Salle County jail as the relevant facility.

125.    The form indicates that Mr. Davis was booked in at 2:20 p.m. on July 31, 2017 and died at 6:57 a.m. on August 1, 2017.  The form indicates that he died in Holding Cell Number 2, and that the last face-to-face contact with Mr. Davis was one-hour thirteen minutes before his death – at 5:44 a.m.  The form also indicates that Frances Garza was the jail officer with the last known contact with Mr. Davis.  Moreover, the form indicates that Sergeant Martinez found Mr. Davis, deceased.

126.    The form indicates that, at the time of Mr. Davis's death, it was unknown whether he was under the influence of alcohol/drugs.  This was a false representation to the TCJS.  The form also indicates that there was no video evidence available for the area in which Mr. Davis died.   The form indicates, as all known medical conditions for Mr. Davis, alcoholism, hypertension, drug addiction, communicable disease, and HIV/Aids positive.

127.    The form concludes with a narrative as to what happened regarding Mr. Davis.  The narrative is clearly written to make it appear as if La Salle County and its employees acted appropriately regarding Mr. Davis.  It does not tell the entire story:

> On July 31, 2017 Mr. James Davis was arrested and brought into our jail on a local warrant.  He was then escorted into a holding cell located in front of the control picket for the night along with 2 other individuals.  Mr. Davis was checked on throughout the night by staff.  At approximately 0629 hours on August 1, 2017 a call came in over the control intercom from one of the individuals housed with Mr. Davis requesting the presence of a jailer due to he noticed that Mr. Davis was not moving and had stopped breathing.  At that time Sgt. Yvette Martinez and Jailer Frances Garza went to go check on Mr. Davis.  Sgt. Martinez began to do CPR on Mr. Davis due he was not being responsive and she requested EMS at the jail.  CPR was still being conducted by Sgt. Martinez until EMTS arrived and took over. EMTS continued the CPR but could not get a pulse from Mr. Davis and pronounced

him dead at 0645 hours.  Justice of the Peace George Trigo was present and ordered the autopsy.

128.    "Checking on" Mr. Davis, even if it occurred, is insufficient.[2]  In addition to State-required face-to-face observations, Defendants should have actually done something.  They should immediately had Mr. Davis transported to an area hospital, where he would have received life-saving treatment and as a result survived.

129.    Life-saving treatment for what caused Mr. Davis's death was readily available, and it would have saved his life.  There were hospitals available in the area, including hospitals in Dimmit, Laredo, Frio, Jourdanton, and San Antonio.  There is more than one hospital in the City of San Antonio that had an emergency department, and hospitals in the other mentioned cities/towns also had emergency departments available to treat Mr. Davis and save his life.

130.    The fact that Defendants may have "checked on" Mr. Davis at any point, without doing anything as a result of his clear and apparent need for serious medical treatment, reminds one of a recent commercial for LifeLock.  LifeLock is a credit monitoring company that also purports to resolve and/or avoid credit issues.  In the commercial, an apparent dentist and assistant are shown examining a man in a dental chair.  The following conversation ensues:

| | |
|---|---|
| Apparent dentist: | David, you have one of the worst cavities I have ever seen.  Okay.  Have a good day. |
| Patient: | Aren't you going to fix it? |
| Apparent dentist: | Oh, I'm not a dentist, I'm a dental monitor . . .  tell you when you have a bad cavity. |
| Apparent dental assistant: | It's bad.  Lunch? |
| Apparent dentist: | Oh, yes. |

---

[2]    It has become clear that Defendants did not even "check on" Mr. Davis as alleged in jail logs.  As described elsewhere in this pleading, jail logs were falsified in an attempt to cover up what actually occurred, and which led to Mr. Davis's unnecessary and horribly painful death.

Patient:                    Where are you going?

https://www.youtube.com/watch?v=CGDzxPsdi7w

The "patient" was shocked that the purported dentist and dental assistant knew that he had a bad cavity and would do nothing about it.  The purported dentist and dental assistant merely noted that the supposed patient had a serious problem.

131.    The commercial is humorous and makes the point that LifeLock goes beyond simply monitoring credit.   LifeLock actually does something about credit problems.  Unfortunately, with regard to "monitoring" Mr. Davis, there is no humor in its application.  It did little good to "monitor" Mr. Davis.  Mr. Davis did not need monitoring.  He needed emergency medical treatment.  If it had been provided, he would have lived.  Thus, the deliberate indifference and objective unreasonableness of natural people mentioned in this pleading, regarding Mr. Davis's known serious health issues, in addition to and combined with La Salle County's policies, practices, and/or customs, were moving forces behind and resulted in and caused Mr. Davis's unnecessary, painful death.

E.      Knowledge and Education

1.      Defendants Knew That Jail Intoxication Deaths Are a Widespread Problem

132.    Jail deaths as a result of drug/alcohol intoxication, as Defendants knew before incarcerating Mr. Davis, are a significant problem in the United States.  Seven-hundred forty (740) people died in local jails in the United States from year 2000 to year 2014 as a result of drug and/or alcohol intoxication.  Thus, individual jailers must look for signs of such intoxication and, when appropriate, refuse to keep people in jail, but instead have them transferred to an appropriate

medical facility for emergency medical treatment.  This is particularly true with someone such as Mr. Davis, who presented no flight risk and/or risk of being aggressive and/or assaultive.

133.    There is likewise no excuse for natural person Defendants' and/or La Salle County's failure to provide appropriate care to Mr. Davis, as well as other people similarly situated. When people such as Mr. Davis are incarcerated against their will, those who are incarcerating them, which include individual people and, in this case, La Salle County, have non-delegable obligations to meet constitutional requirements.

134.    Circuit Judge Goldberg, writing a concurring opinion on behalf of the United States Court of Appeals for the Fifth Circuit nearly 30 years ago (in 1992), unambiguously wrote that the right to continual monitoring of prisoners with suicidal tendencies was clearly established.  This case certainly does not involve suicide, but Judge Goldberg's comments are instructive regarding the need to seriously and immediately address needs of pre-trial detainees such as Mr. Davis.

135.    In *Rhyne vs. Henderson County*, 973 F.2d 386 (5th Cir. 1992), the mother of a pre-trial detainee brought suit for the death of her child.  Judge Goldberg warned and put on notice all policymakers within the jurisdiction of the United States Court of Appeals for the Fifth Circuit (Texas, Louisiana, and Mississippi), regarding pre-trial detainees in need of mental health care (and specifically those with suicidal tendencies):

> Fortunately, the policymakers in charge can learn from their mistakes and take the necessary additional steps to insure the safety of pretrial detainees in need of mental health care. Other municipalities should also take heed of the tragic consequences which are likely to ensue in the absence of adequate safety measures to deal with detainees displaying suicidal tendencies.
>
> What we learn from the experiences of Henderson County [Texas] is that when jailers know a detainee is prone to committing suicide, a policy of observing such a detainee on a periodic, rather than on a continuous, basis, will not suffice; that vesting discretion in untrained jail personnel to assess the need for, and administer, mental health care, will not be responsive to the medical needs of mentally ill detainees; and that delegating the task of providing mental health care to an agency that is incapable of dispensing it on the weekends will endanger the well-being of

its emotionally disturbed detainees. **We need not remind jailers and municipalities that the Constitution works day and night, weekends and holidays—it takes no coffee breaks, no winter recess, and no summer vacation**.

*Id.* at 395-96 (emphasis added).

Application of Judge Goldberg's opinion to the facts of this case is fairly straightforward. The United States Constitution guarantees to Mr. Davis are pursuant to the same amendment from which guarantees to suicidal inmates arise. There is no excuse for completely ignoring Mr. Davis's known, serious, and life-threating medical needs, regardless of the time of day or night.

### 2. Defendants' Training and Education

136. The Texas Commission on Law Enforcement ("TCOLE") keeps records of the service history and some training and education of the natural person Defendants and which relates to law enforcement and/or jailer activities. TCOLE records, as shown below, indicate that each of the natural person Defendants had sufficient experience and/or education, such that they were fully aware that Mr. Davis needed emergency medical treatment.

137. TCOLE records indicate the following service history for Jailer Hernandez:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer (Full-time) | La Salle County Sheriff's Office | Jailer License | 05/11/15 | 09/01/17 |
| Jailer (Full-time) | Frio County Sheriff's Office | Jailer License | 01/18/13 | 08/10/13 |
| Jailer | Frio County Sheriff's Office | Jailer License | 05/01/07 | 02/15/08 |
| Jailer | Frio County Sheriff's Office | Jailer License | 06/28/05 | 01/29/07 |
| Jailer | Frio County Sheriff's Office | Temporary Jailer License | 07/17/02 | 01/15/04 |

138. TCOLE records indicate that Jailer Hernandez received the following training and/or education, through which she should have obtained sufficient knowledge to know that her

failure to act appropriately with regard to Mr. Davis would have been unreasonable, deliberately indifferent, and a constitutional violation:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3502 | Inmate Rights and Privileges (Intermediate) | 12/20/16 | 16 | Bill Blackwood LEMI of Texas |
| 2084 | Jail/Correction Inservice | 11/22/16 | 8 | Bill Blackwood LEMI of Texas |
| 2084 | Jail/Correction Inservice | 05/19/16 | 8 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County Jail Course | 10/18/05 | 100 | Laredo College Regional Law Enforcement |

139.    TCOLE records indicate the following service history for Sergeant Martinez:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer (Full-time) | La Salle County Sheriff's Office | Jailer License | 01/13/14 | 11/17/17 |
| Contract Jailer | La Salle County Sheriff's Office | Jailer License | 04/01/09 | 02/13/15 |
| Contract Jailer | La Salle County Sheriff's Office | Jailer License | 09/29/08 | 02/10/09 |
| Jailer | La Salle County Sheriff's Office | Jailer License | 12/14/07 | 10/01/08 |
| Jailer | Frio County Sheriff's Office | Jailer License | 01/01/07 | 11/15/07 |
| Jailer | La Salle County Sheriff's Office | Jailer License | 04/01/04 | 10/10/04 |
| Jailer | Frio County Sheriff's Office | Jailer License | 01/31/03 | 03/31/04 |

140.    TCOLE records indicate that Sergeant Martinez received the following training and/or education, through which she should have obtained sufficient knowledge to know that her failure to act appropriately with regard to Mr. Davis would have been unreasonable, deliberately indifferent, and a constitutional violation:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3502 | Inmate Rights and Privileges (Intermediate) | 12/20/16 | 16 | Bill Blackwood LEMI of Texas |
| 3520 | What to Expect During an Inspection | 07/06/15 | 8 | Bill Blackwood LEMI of Texas |
| 3520 | What to Expect During and Inspection | 09/16/14 | 4 | Bill Blackwood LEMI of Texas |
| 3519 | Objective jail Classification | 05/05/14 | 4 | Bill Blackwood LEMI of Texas |
| 3518 | Assessing for Suicide, Medical, and Mental Impairment | 03/13/14 | 4 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County Jail Course | 06/27/03 | 80 | Alamo LEA |

141.    TCOLE records indicate the following service history for Jailer Garza:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer (Full-time) | Medina County Sheriff's Office | Jailer License | 05/02/18 | |
| Jailer (Full-time) | La Salle County Sheriff's Office | Jailer License | 12/08/17 | 03/26/18 |
| Jailer (Full-time) | La Salle County Sheriff's Office | Temporary Jailer License | 10/11/16 | 10/11/17 |
| Jailer | Frio County Sheriff's Office | Temporary Jailer License | 06/23/99 | 08/10/04 |

142.    TCOLE records indicate that Jailer Garza received the following training and/or education, through which she should have obtained sufficient knowledge to know that her failure to act appropriately with regard to Mr. Davis would have been unreasonable, deliberately indifferent, and a constitutional violation:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|

| 3519 | Objective Jail Classification | 03/11/19 | 4 | TEEX Central Texas Police Academy |
| 3737 | New Supervisor's Course | 12/20/18 | 24 | Bill Blackwood LEMI of Texas |
| 4900 | Mental Health Training for Jailers | 06/26/18 | 8 | Bill Blackwood LEMI of Texas |
| 1071 | Basic County Corrections Classroom Component | 11/10/17 | 24 | TEEX Distance Basic County Corrections |
| 1070 | Basic County Corrections D. E. Component | 10/09/17 | 72 | TEEX Distance Basic County Corrections |
| 2084 | Jail/Correction Inservice | 11/17/16 | 8 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County jail Course | 11/19/99 | 80 | Alamo Area LEA |

143.    TCOLE records indicate the following service history for Jailer Olivarez:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer (Full-time) | La Salle County Sheriff's Office | Jailer License | 03/27/14 | |
| Jailer | La Salle County Sheriff's Office | Jailer License | 03/03/08 | 12/22/10 |
| Jailer | La Salle County Sheriff's Office | Temporary Jailer License | 02/09/07 | 03/03/08 |

144.    TCOLE records indicate that Jailer Olivarez received the following training and/or education, through which she should have obtained sufficient knowledge to know that her failure to act appropriately with regard to Mr. Davis would have been unreasonable, deliberately indifferent, and a constitutional violation:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 4900 | Mental Health Training for Jailers | 03/15/19 | 8 | Sheriff's Association of Texas |

| 2084 | Jail/Correction Inservice | 11/17/16 | 8 | Bill Blackwood LEMI of Texas |
|------|---------------------------|----------|---|------------------------------|
| 3518 | Assessing for Suicide, Medical, and Mental Impairments | 08/13/14 | 4 | Bill Blackwood LEMI of Texas |
| 3519 | Objective Jail Classification | 05/05/14 | 4 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County jail Course | 03/03/08 | 96 | Alamo Area LEA |

145.   TCOLE records indicate the following service history for Dispatcher/Jailer Murray:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|--------------|------------|-------|--------------------|------------------|
| Telecom-munications Operator (Full-time) | La Salle County Sheriff's Office | Telecommunications Operator License | 04/06/18 | |
| Telecom-munications Operator (Full-time) | La Salle County Sheriff's Office | Temporary Telecommunications Operator License | 04/11/17 | 04/06/18 |
| Jailer (Full-time) | La Salle County Sheriff's Office | Jailer License | 09/08/16 | |
| Jailer (Full-time) | La Salle County Sheriff's Office | Temporary Jailer License | 04/29/16 | 09/08/16 |
| Jailer | La Salle County Sheriff's Office | Temporary Jailer License | 07/25/09 | 05/29/10 |

146.   TCOLE records indicate that Dispatcher/Jailer Murray received the following training and/or education, through which she should have obtained sufficient knowledge to know that her failure to act appropriately with regard to Mr. Davis would have been unreasonable, deliberately indifferent, and a constitutional violation:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|------------|--------------|-------------|--------------|-------------|
| 400 | Emergency Management for People with Disabilities | 03/19/19 | 1 | TCOLE Online |

| 3925 | Ethics for Law Enforcement Distance | 03/09/19 | 4 | TCOLE Online |
|---|---|---|---|---|
| 3519 | Objective Jail Classification | 01/31/19 | 4 | TEEX Central Texas Police Academy |
| 1013 | Basic Telecommunications Certification Course | 04/03/18 | 40 | TEEX Central Texas Police Academy |
| 2120 | Crisis Communications Telecommunicator Intermed | 04/03/18 | 24 | TEEX Central Texas Police Academy |
| 420 | Crisis Communications Telecommunicator | 03/16/18 | 24 | TCOLE Online |
| 3502 | Inmate Rights and Privileges (Intermediate) | 12/20/16 | 16 | Bill Blackwood LEMI of Texas |
| 2084 | Jail/Correction Inservice | 11/22/16 | 8 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County Jail Course | 09/07/16 | 96 | Alamo Area LEA |

147.    TCOLE records indicate the following service history for Jail Administrator Ramirez:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer (Full-time) | La Salle County Sheriff's Office | Jailer License | 01/30/15 | 02/06/18 |
| Jailer (Full-time) | La Salle County Sheriff's Office | Temporary Jailer License | 12/02/13 | 12/02/14 |
| Jailer | La Salle County Sheriff's Office | Jailer License | 04/23/04 | 12/22/09 |
| Jailer | Frio County Sheriff's Office | Jailer License | 09/17/98 | 05/18/01 |

148.    TCOLE records indicate that Jail Administrator Ramirez received the following training and/or education, through which she should have obtained sufficient knowledge to know that her failure to act appropriately with regard to Mr. Davis would have been unreasonable, deliberately indifferent, and a constitutional violation:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 4900 | Mental Health Training for Jailers | 12/20/17 | 8 | Bill Blackwood LEMI of Texas |
| 3925 | Ethics for Law Enforcement Distance | 03/23/17 | 4 | TCOLE Online |
| 2084 | Jail/Correction Inservice | 11/17/16 | 8 | Bill Blackwood LEMI of Texas |
| 3518 | Assessing for Suicide, Medical, and Mental Impairments | 05/11/16 | 4 | Bill Blackwood LEMI of Texas |
| 3514 | Jail Administration | 09/25/15 | 41 | Bill Blackwood LEMI of Texas |
| 3520 | What to Expect During an Inspection | 07/06/15 | 8 | Bill Blackwood LEMI of Texas |
| 1071 | Basic County Corrections Classroom Component | 10/09/14 | 24 | TEEX Distance Basic County Corrections |
| 3520 | What to Expect During an Inspection | 09/16/14 | 4 | Bill Blackwood LEMI of Texas |
| 1070 | Basic County Corrections D. E. Component | 06/20/14 | 72 | TEEX Distance Basic County Corrections |
| 3519 | Objective Jail Classification | 05/05/14 | 4 | Bill Blackwood LEMI of Texas |
| 3518 | Assessing for Suicide, Medical, and Mental impair | 02/20/14 | 4 | Bill Blackwood LEMI of Texas |
| 3500 | Jail | 05/15/09 | 19 | Bill Blackwood LEMI of Texas |
| 3700 | Management/ Supervision | 07/26/07 | 16 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County jail Course | 08/13/99 | 80 | Alamo Area LEA |
| 1005 | Basic Jail Course | 02/15/91 | 40 | Laredo College Regional Law Enforcement |

F.      Texas Commission on Jail Standards

      1.      Notice of Non-Compliance and Technical Assistance to La Salle County

149.    The TCJS conducted an investigation into Mr. Davis's death.  The TCJS's Death in Custody Checklist indicates that a "[n]otice of non-compliance and technical assistance memorandum [was] issued' on November 16, 2017 regarding Mr. Davis's death.  The notice was issued by TCJS inspector Shannon Herklotz.  The TCJS executive director concurred with the notice of non-compliance and technical assistance memorandum.  The technical assistance memorandum was directed to Sheriff Miguel Rodriguez and Chief Dorothy Ramirez, jail administrator for La Salle County.

150.    The notice of non-compliance and technical assistance memorandum was based primarily on work done by TCJS inspector Wendy Wisneski.  That document noted one of the issues regarding Mr. Davis: "In one of the videos, which included audio, [inmate] Davis could be heard groaning and asking for help.  An officer stated [inmate] Davis was withdrawing, but did not provide any assistance."  The TCJS, regarding this issue, wrote:

> Remedial training shall be provided to ensure all jail staff know their job duties and responsibilities.  Once training is completed and all jailers have signed off on said training, submit a copy of the roster to TCJS to be placed in the La Salle Co[unty] File.

151.    The TCJS report noted that, "[a]fter careful review of all paperwork it was determined that two (2) verified violations of minimum jail standards occurred . . . ."  The TCJS's November 16, 2017 special inspection report read in part, "You are urged: (1) to give these areas of noncompliance your serious and immediate consideration; and (2) to promptly initiate and complete appropriate corrective measures."  The report also noted that, if La Salle County chose to continue in its noncompliance with Texas law, a remedial order might be issued in accordance with Chapter 297.8.  The TCJS file related to Mr. Davis's death also cited provisions violated by

La Salle County and showed the County's, and its employees', deliberate indifference, objective

unreasonableness, and conscious disregard of pre-trial detainee rights.

### TEXAS COMMISSION ON JAIL STANDARDS
### JAIL INSPECTION REPORT

**Facility Name:** La Salle County Jail    **Date:** November 16, 2017

| Item | Section | Paragraph | Comments |
|------|---------|-----------|----------|
| 1 | 265 | .3 | Inmates confined in a holding cell or detoxification cell shall be observed by facility personnel at intervals not to exceed 30 minutes. |
| | | | **After a careful review of paperwork provided as well as video evidence, it was determined that the welfare checks of inmates in holding or detox exceeded 30 minutes or were not documented/completed at all as required by minimum jail standards.** |
| 2 | 275 | .1 | Every facility shall have the appropriate number of jailers at the facility 24 hours each day. Facilities shall have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every 60 minutes. Observation shall be performed at least every 30 minutes in areas where inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior are confined. There shall be a two-way voice communication capability between inmates and jailers, licensed peace officers, bailiffs, and designated staff at all times. Closed circuit television may be used, but not in lieu of the required personal observation. |
| | | | **A careful review of paperwork provided, it was determined that face-to-face observations either exceeded the 60 minute time limit or the jail staff failed to document the welfare checks as mandated by minimum jail standards.** |

*Wendy Wisneski - TCJS Inspector*

152.    TCJS records also contain emails between TCJS and La Salle County employees.

One email from Jail Administrator Dorothy Ramirez, who had the rank of "chief," to TCJS

inspector Wendy Wisneski provided the following answers to the following questions propounded

by Ms. Wisneski.

&gt;
&gt; Sincerely,
&gt;
&gt;
&gt; Wendy Wisneski
&gt; Critical Incident Inspector
&gt; Texas Commission on Jail Standards
&gt; P.O. Box 12985
&gt; Austin, TX 78711
&gt; 512-463-8081 office
&gt; 512-799-6648 cell
&gt; wendy.wisneski@tcjs.state.tx.us
&gt;
&gt;
&gt;
&gt; -----Original Message-----
&gt; From: dottie.ramirez@co.la-salle.tx.us
&gt; [mailto:dottie.ramirez@co.la-salle.tx.us]
&gt; Sent: Friday, September 29, 2017 11:01 AM
&gt; To: Wendy Wisneski <wendy.wisneski@tcjs.state.tx.us>
&gt; Cc: dottie.ramirez <dottie.ramirez@co.la-salle.tx.us>
&gt; Subject: Re: DIC I/M James Davis Questions Answered
&gt;
&gt; Mrs. Wisneski,
&gt;
&gt; My apologies for not replying sooner to your questions.
&gt;
&gt; 1. Was this inmate seen by medical personnel before or after he was
&gt; booked in? Mr. Davis had refused medical attention when asked by the
&gt; deputy making the arrest. And informed
&gt;    the jailers when he arrived at the jail with Mr. Davis of his
&gt; refusal in front of Mr. Davis.
&gt;
&gt; 2. Was he placed on any type of withdrawal protocol? Mr. Davis was
&gt; placed in the Holding tank which is in front of Control Picket with
&gt; other inmates for the night.
&gt;
&gt; 3. Do you have medical staff available for medical issues documented
&gt; at intake? No
&gt;
&gt; 4. Do you have any video available of the holding area where the
&gt; inmate was placed from book-in time until the time of his death?
&gt; No-Texas Ranger retrieved video footage
&gt;
&gt; 5. Have you received the final report from the Rangers? No not yet
&gt;
&gt; 6. Have you received the final autopsy report? No not yet
&gt;
&gt;
&gt;  Thank You,
&gt;  Dorothy Ramirez
&gt;

2

(Highlighting in original document received in response to Public Information Act request).

153.     It appears that La Salle County may have attempted to deceive the TCJS related to TCJS's investigation of Mr. Davis's death by providing a copy of a Screening Form for Suicide and Medial/Mental/Developmental Impairments other than the one actually in the jail file for Mr. Davis at the time of his death.  The form below has added to it Ms. Hernandez's signature, as well as a line to be signed by, presumably, Ms. Hernandez's supervisor.

AUG 0 2 2017

Texas Commission on Jail Standard

## Screening Form for Suicide and Medical/Mental/Developmental Impairments

| County: La Salle | Date and Time: 07-31-2017 02:20 PM | Name of Screening Officer: MARTINEZ, YVETTE - 3512 |

| Inmate's Name: DAVIS, JAMES DEAN | Gender: M | | If female, pregnant? Yes □ No ☒ Unknown □ |

Serious injury/hospitalization in last 90 days? Yes □ No ☒ If yes, describe:

Currently taking any prescription medications? Yes □ No ☒ If yes, what:

Any disability/chronic illness (diabetes, hypertension, etc.) Yes □ No☒ If yes, describe:

Does inmate appear to be under the influence of alcohol or drugs? Yes ☒ No □ If yes, describe:

Do you have a history of drug/alcohol abuse? If yes, note substance and when last used all sorts of drugs and some alcohol

\*Do you think you will have withdrawal symptoms from stopping the use of medications or other substances (including alcohol or drugs) while you are in jail? If yes, describe  drug addiction

\*Have you ever had a traumatic brain injury, concussion, or loss of consciousness? Yes □ No ☒ If yes, describe:

\*If yes, Notify Medical or Supervisor Immediately

*Place inmate on suicide watch if Yes to 1a-1d or at any time jailer/supervisor believe it is warranted*

| | YES | NO | "Yes" Requires Comments |
|---|---|---|---|
| *IF YES TO 1a, 1b,1c.or 1d BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY* | | | |
| Is the inmate unable to answer questions? If yes, note why, notify supervisor and place on suicide watch until form completed. | | x | |
| 1a. Does the arresting/transporting officer believe or has the officer received information that inmate may be at risk of suicide? | | x | |
| 1b. Are you thinking of killing or injuring yourself today? If so, how? | | x | |
| 1c. Have you ever attempted suicide? If so, when and how? | | x | |
| 1d. Are you feeling hopeless or have nothing to look forward to? | | x | |
| *IF YES to 2-12 BELOW, NOTIFY SUPERVISOR AND MAGISTRATE. Notify Mental Health when warranted* | | | |
| 2. Do you hear any noises or voices other people don't seem to hear? | | x | |
| 3. Do you currently believe that someone can control your mind or that other people can know your thoughts or read your mind? | | x | |
| 4. Prior to arrest, did you feel down, depressed, or have little interest or pleasure in doing things? | | x | |
| 5. Do you have nightmares, flashbacks or repeated thoughts or feelings related to PTSD or something terrible from your past? | | x | |
| 6. Are you worried someone might hurt or kill you? If female, ask if they fear someone close to them. | | x | |
| 7. Are you extremely worried you will lose your job, position, spouse, significant other, custody of your children due to arrest? | | x | |
| 8. Have you ever received services for emotional or mental health problems? | | x | |
| 9. Have you been in a hospital for emotional/mental health in the last year? | | x | |
| 10. If yes to 8 or 9, do you know your diagnosis? If no, put "Does not know" in comments. | | x | |
| 11. In school, were you ever told by teachers that you had difficulty learning? | | x | |
| 12. Have you lost / gained a lot of weight in the last few weeks without trying (at least 5lbs.)? | | x | |
| *IF YES TO 13-16 BELOW, NOTIFY SUPERVISOR, MAGISTRATE, AND MENTAL HEALTH IMMEDIATELY* | | | |
| 13. Does inmate show signs of depression (sadness, irritability, emotional flatness)? | | x | |
| 14. Does inmate display any unusual behavior, or act or talk strange (cannot focus attention, hearing or seeing things that are not there)? | | x | |
| 15. Is the inmate incoherent, disoriented or showing signs of mental illness? | | x | |
| 16. Inmate has visible signs of recent self-harm (cuts or ligature marks)? | | x | |

Additional Comments (Note CCQ Match here):

| Magistrate Notification Date and Time: Electronic or Written (Circle) | Mental Health Notification Date and Time: | Medical Notification Date and Time: |

Supervisor Signature, Date and Time:

X

8  /9  #

Received 08-02-17:12:01AM/LA SALLE COUNTY

(Highlighting in original document received in response to Public Information Act request from TCJS).

154. Upon information and belief, the following timeline was compiled by a TCJS inspector and/or other TCJS staff:

| La Salle | Time | Minutes Between Observations | 07/31/2017-08/01/2017 |
|---|---|---|---|
| | 630 | | Breakfast served |
| | 740 | | Trays picked up |
| | 955 | | Cleaning supplies passed out |
| | 1135 | | Served lunch |
| | 1245 | | Cleaning supplies picked up |
| | 1300 | | Conducted rounds |
| | 1600 | | Trays passed out (Dinner?) |
| | 1700 | | Headcount conducted |
| | 1800 | | Passing out meds |
| | 1900 | | Security check |
| | 1940 | | Security check |
| | 2130 | | Starting indigent |
| | 130 | | Security check |
| | 150 | | Security check |
| | 240 | | Security check |
| | 340 | | Security check |
| | 430 | | Security check |
| | 625 | | Notified by an inmate that Davis does not appear to be breathing |

155. La Salle County apparently failed to learn lessons regarding prisoner observations it should have learned as a result of Mr. Davis's death. Emails by and between the TCJS and

Captain Jose Garcia, with the La Salle County jail, indicate that observations were being done improperly as late as January 2018.

## Wendy Wisneski

| | |
|---|---|
| **From:** | Wendy Wisneski |
| **Sent:** | Tuesday, February 13, 2018 8:21 AM |
| **To:** | 'Jose D.Garcia Jr. ' |
| **Cc:** | Shannon Herklotz |
| **Subject:** | Paperwork |

| **Tracking:** | **Recipient** | **Delivery** |
|---|---|---|
| | 'Jose D.Garcia Jr. ' | |
| | Shannon Herklotz | Delivered: 2/13/2018 8:21 AM |

Good morning, Captain Garcia.

As per our phone conversation on Friday afternoon:

Scan logs from 01/10/18: Holding cell scan done at 1134 hours. Next scan done at 1217 hours. Exceeded the 30 minutes

Scan logs from 01/15/18: Holding cell scan done at 1320 hours. Next scan done at 1444 hours. Exceeded the 30 minutes.

Additionally, written logs are not matching the times scans/rounds are completed. Based on written logs alone, rounds of holding cells and segregation in some instances are exceeding 30 minutes, and rounds of dorms are exceeding 60 minutes. It is recommended that if the written log is kept, the 'Time Check' column listing times (0500-0530, 0530-0600, 0600-0630, etc.) is removed and the actual time the round/scan is conducted is logged into the written form.

Please advise if all personnel are logging into the scanner correctly in order to accurately reflect the name of the jailer conducting the scan.

Finally, please provide updated scan logs from the following dates for review to determine if your facility can be placed back into compliance.

01/28/18
01/31/18
02/04/18
02/07/18

Thank you in advance.

Sincerely,

Wendy Wisneski
Critical Incident Inspector
Texas Commission on Jail Standards
P.O. Box 12985
Austin, TX 78711
512-463-8081 office
512-799-6648 cell
wendy.wisneski@tcjs.state.tx.us

156.    Further, as indicated by Administrator Ramirez, during December 2017 and most of January 2018, only a single jailer's email address was being used in an electronic system for documenting prisoner observations.

**LaSalle County
Jail Division**

# Memo

**To:**       All Jailers

**From:**    Jail Administrator Dorothy Ramirez

**cc:**

**Date:**    January 18, 2018

**Re:**       Cell Check Log- In

All Jailers must log into the Electronic Cell Check using their own email address when doing a security round. I noticed when I printed out the monthly check list for December and most of January that only one jailer's email was being used to do all the rounds. Every Jailer on duty has to have an email address. If you do not have an email address use the Google Gmail account services, they will provide all the jailers with a free email address using their ********@gmail.com servers. I have printed out a copy of a USER Manual and passed it out to every jailer to answer any of your Electronic Monitoring Questions.

Thank You,

Dorothy Ramirez

2.      La Salle County Cited for Other Violations Occurring in its Jail

157.    La Salle County was cited by the TCJS at times other than the time involving Mr. Davis's death.  Upon information and belief, such citations are additional evidence of policies, practices, and/or customs of overcrowding the jail and/or failing to care for prisoners, at the time of Mr. Davis's death.

158.    On June 7, 2011, years before Mr. Davis died, the TCJS determined that the La Salle County jail was non-compliant.  La Salle County was notified, in writing, that it was using the incorrect mental disability/suicide prevention screening form.  This was even more troubling, because the TCJS inspector noted in the report that the appropriate form was provided to La Salle County at the year 2010 annual inspection.  There was no excuse for jail staff not beginning to use the appropriate form, after having it easily provided to them the year before.  La Salle County's failure to comply with minimum jail standards would continue for a number of years and be a proximate and producing cause of Mr. Davis's death.  Longstanding issues at the jail were evidence of the policy, practice, and/or custom of deliberate indifference to the medical and mental health needs of inmates.

159.    On February 18, 2014, the TCJS conducted an inspection of the La Salle County jail and provided technical assistance.  The inspector, when reviewing the mental health/suicide screening form, noted that the County was not – once again – using the latest version of the form required by the TCJS.  The form La Salle County chose to use did not have all required questions. There was no reason for La Salle County not to use the latest form, as it was freely available from the TCJS, upon information and belief, at the TCJS's website

160.    On February 25, 2014, the TCJS issued a notice of non-compliance regarding La Salle County's operation of the La Salle County Detention Center.  The notice of non-compliance

instructed La Salle County that the following corrective actions must be completed upon La Salle County's receipt of the notice:

- Remove all unauthorized bunks from single cells and return the facility to its designed capacity.

- Remove all unauthorized bunks from the multiple – occupancy cells and return the facility to its designed capacity.

Therefore, clearly, La Salle County had chosen to use a jail to house more prisoners than it was allowed to house pursuant to Texas law and minimum jail standards.  La Salle County chose to limit expenditures at the jail at the expense of prisoner safety and compliance with Texas law.

161.    On January 14, 2015, the TCJS conducted an inspection of the La Salle County jail. The inspector provided technical assistance as a result of reviewing inmate files.  The jail had issues with proper maintenance of medical paperwork.  It is critical to keep medical paperwork in proper form and location in a jail, so that prisoners' needs can be met in accordance with constitutional standards.

162.    On January 20, 2016, the TCJS conducted another inspection of the La Salle County jail.  The inspection report noted that the facility had been opened as a full-service jail within the prior 45 days.

163.    On March 14, 2017, the TCJS conducted an inspection of the La Salle County jail. The TCJS inspector provided technical assistance because, during a review of inmate medical files, the inspector noted that there were some issues with two inmate screening forms.  Both forms had a positive response in Section 2-12, which would have required notification of a magistrate and a jail supervisor.  La Salle County's continued issues with using appropriate forms related to medical care and mental health care showed deliberate indifference inherent in the development of policy, practice, and/or custom in La Salle County regarding the medical and mental health needs of prisoners within its care.

164.    On November 16, 2017, TCJS inspector Wendy Wisneski conducted an inspection of the La Salle County jail.  The jail was found to be non-compliant.  Ms. Wisneski determined, after a careful review of paperwork provided by the jail as well as video evidence, welfare checks of inmates in holding and/or detoxification cells exceeded 30 minutes or, in the alternative, were not documented and/or completed at all as required by Texas minimum jail standards.

165.    The inspector also determined, after carefully reviewing paperwork provided to her that face-to-face observations of prisoners either exceeded the 60-minute time limit, or jail staff failed to document welfare checks as mandated by minimum jail standards.  These were serious violations, and they were the kind of violations which caused and proximately caused Mr. Davis's death.

166.    On May 8, 2018, a few months after Mr. Davis died, the TCJS conducted another inspection of the La Salle County jail that demonstrates La Salle County's continued policy, practice, and/or custom of dealing with inmates.  Even though the inspection was after Mr. Davis's death, jail deficiencies demonstrated an apparent longstanding practice of inappropriately dealing with prisoners and/or choosing to maintain an unsafe jail.

167.    TCJS provided technical assistance to La Salle County after reviewing life safety paperwork.  The TCJS inspector learned that the last fire marshal inspection for the jail had expired over one year before – on May 4, 2017.

168.    The TCJS inspector also reviewed a random sample of ten prisoner files, interviewed staff, and reviewed La Salle County jail policy.  The TCJS inspector provided technical assistance to La Salle County after learning that a female prisoner had been held in a holding cell for over 48 hours.  This was a violation of Texas minimum jail standards.

169.    Additional technical assistance was provided when the TCJS inspector, while reviewing inmate classification files, learned that on occasion inmates were not reassessed every

30 – 90 days as required by Texas jail standards.  The inspector also verified that many new jail officers had not received the 4–hour jail certification class required by Texas jail standards.

170.    Technical assistance was also provided in a problem area which certainly should have been remedied after Mr. Davis's death.  The TCJS inspector, when reviewing mental health screening documentation, learned that magistrate notification was not always being conducted by jail staff as required by Article 16.22 of the Texas Code of Criminal Procedure.  The inspector also learned that supervisors, on occasion, were not signing the bottom of the form as required by Texas jail standards.  The continued failure to appropriately respond to prisoners such as Mr. Davis was further evidence of a widespread practice, policy, and custom of the La Salle County jail to disregard serious medical and/or mental health needs (such as the medical needs of Mr. Davis).

171.    Technical assistance was also provided as a result of the May 2018 inspection due to the La Salle County jail administrator not even having a jailer's license.  It is beyond reasonable explanation that, after a tragedy such as Mr. Davis's death, La Salle County would allow a jail administrator to act without receiving a license.  This was also evidence of La Salle County policy, practice, and/or custom of being deliberately indifferent to the needs of inmates and acting in an objectively unreasonable manner regarding such.

G.    *Monell* Liability of La Salle County

172.    Plaintiff sets forth in this section of the pleading additional facts and allegations supporting *Monell* liability claims against La Salle County.  It is Plaintiff's intent that all facts asserted in this pleading relating to policies, practices, and/or customs of La Salle County support such *Monell* liability claims, and not just facts and allegations set forth in this section.  Such policies, practices, and customs alleged in this pleading were moving forces behind and proximately caused the constitutional violations and damages asserted herein.

173.    La Salle County knew, when it incarcerated Mr. Davis in July and August 2017, that its personnel, policies, practices, and customs were insufficient to protect prisoners and provide appropriate medical treatment.  La Salle County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread custom that such custom became the policy of La Salle County as it related to its jail.

174.    There were numerous policies, practices, and/or customs at La Salle County which were moving forces behind, caused, and proximately caused Mr. Davis's death.  Administrator Ramirez said that there was no written policy regarding when medical treatment would be obtained for a prisoner.  Thus, the County made a deliberate decision, acting in a deliberately indifferent manner, to leave individual jailers with the unilateral decision as to when they believe a prisoner should receive healthcare.  When the County made such policy, and/or implemented it through custom and practice, it knew with certainty that the result would be serious injury, physical illness, and/or death.

175.    The County also was deliberately indifferent by failing to implement any policy whatsoever regarding prisoners in its jail who were detoxing from, and/or were under serious effects of, alcohol and/or drugs.  Jailer Hernandez mentioned providing an orange, sugar, or bread to such a detoxing person.  This evidences the complete lack of policy, practice, and/or custom as to how to treat such detoxing prisoners.  Detoxing prisoners need emergency medical treatment, at a local hospital.  They do not need oranges, sugar, or bread.  When La Salle County chose not to implement such a policy, it did so with the knowledge, to a certainty, that prisoners would succumb to life-long injuries and/or death as a result.

176.    La Salle County also chose to understaff its jail.  Sergeant Martinez mentioned during her interview that more jail staff was needed.  The County's failure to appropriately staff

its jail was a moving force behind and proximately caused Mr. Davis's death.  When the County chose not to expend sufficient funds to staff its jail, it did so with the knowledge, to a certainty, that significant injury and/or death would occur.

177.    Another troubling policy of La Salle County, which gives rise to *Monell* claims against it, is that of not booking certain people into its jail until the day after intake if such people are under the influence of drugs and/or alcohol.   Jailer Olivarez described this procedure. However, in fact, it was La Salle County's policy, practice, and/or custom, for some prisoners (such as Mr. Davis), to never book them into the jail.  This is a clear and unabashed violation of TCJS standards, and such policy, practice, and/or custom was implemented with the certain knowledge that prisoners would become seriously injured and die as a result.

178.    Further, as described elsewhere in this pleading, La Salle County had a policy, practice, and/or custom of failing to train and supervise its jail employees.  In fact, after Mr. Davis's death, the TCJS cited such failure as being a cause of Mr. Davis's death.

179.    La Salle county policy, practice, and/or custom of both failing to observe inmates at minimum intervals required by the TCJS, and further falsifying logs as to such observations, were moving forces behand and proximately caused Mr. Davis's death.  There is no excuse for not providing minimum observations of prisoners who are ill, such as Mr. Davis, or likewise falsifying records to indicate observations which never occurred actually did occur.

180.    La Salle County Commissioner's Court held, on February 10, 2017, a regular meeting.  The court discussed and/or possible action of approving inter local jail inmate housing contracts with both Zavala County and Frio County.  Upon information and belief, this is evidence of La Salle County jail overcrowding.

181.    La Salle County Commissioner's Court held, on March 20, 2018, a regular meeting. The court discussed and/or possibly took action on a contract with South Texas Health Rural

Services, Inc. to provide medical services for the jail in which Mr. Davis died.  Upon information and belief, this decision was out of recognition that policies, practices, and/or customs in place at the time of Mr. Davis's death were unconstitutional and led to Mr. Davis's death.

182.    La Salle County Commissioner's Court held, on June 18, 2018, a regular meeting. The court discussed and/or possibly took action on software for the jail including but not limited to SmartCop.   Upon information and belief, County Commissioners knew that procedures, policies, practices, and/or customs in place to monitor inmates, at the time that Mr. Davis's death, were unconstitutional and would continue absent replacement of the outmoded system of making manual entries when prisoners were allegedly observed.

III.    Causes of Action

A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

183.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using excessive force against him.   *Id*. at 2470.   The Court was determining the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original).  The United States Supreme Court concluded that only the objectively unreasonable standard was the correct standard to be used in excessive force cases, and that the officer's subjective awareness was irrelevant.  *Id.*  The Court did so, acknowledging and resolving disagreement among the Circuits.  *Id.* at 2471-72.

184.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove."  *Id.* at 2472.  Instead, "courts must use an objective standard."  *Id* at 2472-

73.   "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable."  *Id.* at 2473.   Thus, the Court required no *mens rea*, no conscious violation, and no subjective belief or understanding of the offending police officers for an episodic claim but instead instructed all federal courts to analyze officers' conduct on an objective reasonability basis.   There is no reason to treat pretrial detainees' other rights arising under the 14th Amendment's due process clause – such as the right to receive reasonable medical and mental health care, the right to be protected from harm, and the right not to be punished – differently.

185.   It appears that this standard is now the law of the land.   In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983.   *Id.* at 418.   The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment."  *Id.* at 419 (citation omitted).   The Fifth Circuit determined, even though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case.   *Id.* at 419-20.   A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless."  *Id.* at 420 (citation omitted).   However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit.   *Id.* at 420 and 424-25.[3]

---

[3] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996).   In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the

186.    The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*. First, the panel was bound by the Fifth Circuit's "rule of orderliness." *Id.* at 420 n.4. Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims. *Id.* Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*. *Id.* Even so, the Fifth Circuit noted,

─────────────────────

force they used against Kingsley." *Kingsley*, 135 S.Ct. at 2472. However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*. Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners. We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476. This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees." *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015). The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*. Likewise, the two subsequent cases also cited by the majority did not address or distinguish *Kingsley*. *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016). Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

nearly twenty-five years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases. *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

187.    Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.   The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that such a burden should be placed upon a plaintiff.

> **B.** **Cause of Action Against All Natural Person Defendants (Beatrice Marie Hernandez, Yvette Marie Martinez, Francisca G. Garza a/k/a Frances Garza, Ana Maria Olivarez a/k/a Anna Maria Olivarez, Sarah Elizabeth Murray, and Dorothy Marie Ramirez) Under 42 U.S.C. § 1983 for Violation of Mr. Davis's 14th Amendment Due Process Rights to Reasonable Medical Care, to be Protected, and not to be Punished**

188.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, all natural person Defendants (Beatrice Marie Hernandez, Yvette Marie Martinez, Francisca G. Garza a/k/a Frances Garza, Ana Maria Olivarez a/k/a Anna Maria Olivarez, Sarah Elizabeth Murray, and Dorothy Marie Ramirez) are liable to Plaintiff (individually and as the heir of Mr. Davis, and to Peggy Hebert), pursuant to 42 U.S.C. § 1983, for violating Mr. Davis's rights to reasonable medical care, to be protected, and not to be punished as a pretrial detainee.  These rights are guaranteed by the 14th Amendment to the United States Constitution.  Pre-trial detainees are entitled to a greater degree of medical care

than convicted inmates, according to the Fifth Circuit Court of Appeals.  Pre-trial detainees are also entitled to protection, and also not to be punished at all since they have not been convicted of any crime resulting in their incarceration.

189.    All natural person Defendants acted and failed to act under color of state law at all times referenced in this pleading.  They wholly or substantially ignored Mr. Davis's obvious serious medical needs, and they were deliberately indifferent to those needs.  They failed to protect Mr. Davis, and their ignoring and/or making fun of him, as well as other actions and/or inaction described in this pleading, resulted in unconstitutional punishment of him.  All natural person Defendants were aware of the excessive risk to Mr. Davis's health and safety and were aware of facts from which an inference could be drawn of serious harm and death.  Moreover, they in fact drew that inference.  All natural person Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents.

190.    All natural person Defendants are also liable pursuant to the theory of bystander liability.  That theory of liability applies when the bystander jailer (1) knows that a fellow jailer is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.  As demonstrated through facts asserted in this pleading, natural person Defendants actions and inaction meet all three elements.  Therefore, natural person Defendants are liable to Plaintiff, individually and as heir of Mr. Davis, and to Peggy Hebert, pursuant to this theory.

191.    In the alternative, all natural person Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined

the state of mind necessary, if any, for officers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Constitutional rights set forth in this section of the pleading, and the constitutional right affording a pretrial detainee protection against excessive force, all flow from the 14th Amendment's Due Process Clause. *Id*. Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations should be identical.

192. Natural person Defendants are not entitled to qualified immunity.[4] Their denial of reasonable medical care, and other actions and/or inaction set forth in this pleading, proximately caused, and were producing causes of, Mr. Davis's death and other damages suffered by Mr. Davis, Dylan Davis, and Peggy Hebert.

---

[4] The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted. Congress makes laws. Courts do not. However, the qualified immunity defense was invented by judges. Plaintiff respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

The natural person Defendants cannot show that they would fall within the category of persons referenced in the second sentence of this footnote. This would be Defendants' burden, if they choose to assert the alleged defense. Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases). Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity. *Schwartz, supra* at 1798–99. Plaintiff includes allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

193.    The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiff individually, and as the heir of Mr. Davis, and for Peggy Hebert, seek all remedies and damages available under Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  If Mr. Davis had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.  Therefore, Mr. Davis's estate and/or his heir at law (Dylan Davis) suffered the following damages, for which he seeks recovery from natural person Defendants:

- Mr. Davis's conscious physical pain, suffering, and mental anguish;

- Mr. Davis's medical expenses;

- Mr. Davis's funeral expenses;  and

- exemplary/punitive damages.

194.    Dylan Davis and Peggy Hebert also individually seek and are entitled to all remedies and damages available to them for the 42 U.S.C. § 1983 violations.  Dylan Davis seeks those damages due to the wrongful death of his father, and Peggy Hebert seeks those damages due to the wrongful death of her son.  Those damages were caused and/or proximately caused by the natural person Defendants.  Therefore, their actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by Dylan Davis and Peggy Hebert, for which they individually seek compensation:

- loss of services that Peggy Hebert would have received from her son, Mr. Davis;

- expenses for Mr. Davis's funeral;

- past mental anguish and emotional distress suffered by Dylan Davis and Peggy Hebert

resulting from and caused by the death of Mr. Davis;

- future mental anguish and emotional distress suffered by Dylan Davis and Peggy Hebert resulting from and caused by the death of Mr. Davis;

- loss of companionship and society that Dylan Davis and Peggy Hebert would have received from Mr. Davis; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Mr. Davis's constitutional rights. The natural person Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, Mr. Davis's rights and safety. Moreover, Dylan Davis individually, and as Mr. Davis's heir, and also on behalf of and for Peggy Hebert, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

     C.    <u>Cause of Action Against La Salle County Under 42 U.S.C. § 1983 for Violation of Mr. Davis's 14th Amendment Due Process Rights to Reasonable Medical Care, to be Protected, and not to be Punished</u>

195.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant La Salle County is liable to Plaintiff (individually and as the heir of Mr. Davis, and to Peggy Hebert), pursuant to 42 U.S.C. § 1983, for violating Mr. Davis's rights to reasonable medical care, to be protected, and not to be punished as a pre-trial detainee. These rights are guaranteed by the 14th Amendment to the United States Constitution. According to the Fifth Circuit Court of Appeals, the deliberate indifference standard in the context of Section 1983 claims based on official municipal policies is less stringent that the deliberate indifference standard used for Section 1983 claims based on the

isolated actions of individual policymakers.  Whereas the deliberate indifference standard for the actions of individual policymakers requires subjective awareness of the inmate's serious medical condition, the deliberate indifference standard for an official policy or practice Section 1983 claim is objective.  Such an objective standard comports with *Kingsley v. Hendrickson* 135 S.Ct. 2466 (2015).

196.    Pretrial detainees are entitled to a greater degree of medical care than convicted inmates, according to the Fifth Circuit Court of Appeals.  They are also entitled to be protected and not to be punished at all, since they have not been convicted of any crime resulting in their incarceration.  La Salle County acted or failed to act under color of state law at all relevant times. La Salle County's policies, practices, and/or customs were moving forces behind and proximately caused Mr. Davis's death and Plaintiff's (individually and as the heir of Mr. Davis, and Peggy Hebert) resulting damages.

197.    The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate policymaker at the pleadings stage.  Nevertheless, out of an abundance of caution, the sheriff of La Salle County was the relevant chief policymaker over matters at issue in this case. Moreover, in addition, and in the alternative, the jail administrator was the relevant chief policymaker over matters at issue in this case.  Finally, in addition, and in the alternative, the county commissioner's court was the relevant chief policymaker.

198.    La Salle County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to La Salle County prisoners with serious medical issues, as evidenced by allegations set forth in the Factual Allegations section above.  La Salle County acted in an objectively unreasonable manner.   Policies, practices, and/or customs referenced in that section, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of Mr. Davis's rights and showed deliberate indifference to the known

or obvious consequences that constitutional violations would occur.  La Salle County's relevant policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to Mr. Davis.

199.    The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiff individually, and as the heir of Mr. Davis, and for Peggy Hebert, seek all remedies and damages available under Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law.  If Mr. Davis had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action and obtain remedies and damages provided by Texas and federal law.  Therefore, Mr. Davis's estate and/or his heir at law (Dylan Davis) suffered the following damages, for which he seeks recovery from La Salle County:

- Mr. Davis's conscious physical pain, suffering, and mental anguish;

- Mr. Davis's medical expenses; and

- Mr. Davis's funeral expenses.

200.    Dylan Davis and Peggy Hebert also individually seek and are entitled to all remedies and damages available to them for the 42 U.S.C. § 1983 violations.  Dylan Davis seeks those damages due to the wrongful death of his father, and Peggy Hebert seeks those damages due to the wrongful death of her son.  These damages were caused and/or proximately caused by La Salle County.  Therefore, La Salle County's actions, policies, practices, and customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by Dylan Davis and Peggy Hebert, for which they individually seek compensation:

- loss of services that Peggy Hebert would have received from her son, Mr. Davis;

- expenses for Mr. Davis's funeral;

- past mental anguish and emotional distress suffered by Dylan Davis and Peggy Hebert resulting from and caused by the death of Mr. Davis;

- future mental anguish and emotional distress suffered by Dylan Davis and Peggy Hebert resulting from and caused by the death of Mr. Davis; and

- loss of companionship and society that Dylan Davis and Peggy Hebert would have received from Mr. Davis.

Moreover, Dylan Davis individually, and as Mr. Davis' heir, and also on behalf of and for Peggy Hebert, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

### D.      Causes of Action Against La Salle County for Violation of Americans with Disabilities Act and Rehabilitation Act

201.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, La Salle County is liable to Plaintiff (Dylan Davis) pursuant to the Americans with Disabilities Act ("ADA") and federal Rehabilitation Act.  Upon information and belief, La Salle County has been and is a recipient of federal funds.  Therefore, it is covered by the mandate of the federal Rehabilitation Act. The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with mental and physical disabilities in their facilities, program activities, and services, and also reasonably modify such facilities, services, and programs to accomplish this purpose.  Further, Title II of the ADA applies to La Salle County and has the same mandate as the Rehabilitation Act.  Claims under both the Rehabilitation Act and ADA are analyzed similarly.

202.    The La Salle County jail is a "facility" for purposes of both the rehabilitation and ADA, and the jail's operation comprises a program and services for Rehabilitation Act and ADA purposes.  Mr. Davis was a qualified individual for purposes of the Rehabilitation Act and ADA, regarded as having a mental impairment and/or medical condition that substantially limited one or more of his major life activities.  Mr. Davis was therefore disabled.  Mr. Davis was also discriminated against by reason of his disability.

203.    A majority of circuits have held, for purposes of Rehabilitation Act and ADA claims, that one may prove intentional discrimination by showing that a defendant acted with deliberate indifference.  The Fifth Circuit has, as yet, declined to follow the majority view.  Nevertheless, intent can never be shown with certainty.  Direct and circumstantial evidence can be used to support an "intent" jury finding, and allegations in this pleading show that there is more than enough of both.

204.    La Salle County's failure and refusal to accommodate Mr. Davis's mental and/or medical disabilities while in custody violated the Rehabilitation Act and the ADA.  Such failure and refusal caused, proximately caused, and was a producing cause of Mr. Davis's death and Dylan Davis's damages.

205.    La Salle County's violations of the Rehabilitation Act and the ADA included the failure to reasonably modify facilities, services, accommodations, and programs to reasonably accommodate Mr. Davis's disabilities.  These failures and refusals, which were intentional, proximately caused Mr. Davis's death and Dylan Davis's damages.  Because Mr. Davis's death resulted from La Salle County's intentional discrimination against him, Dylan Davis is entitled to the maximum amount of compensatory damages allowed by law.  Dylan Davis seeks all such damages itemized in the prayer and or body in this pleading (including sections above giving appropriate and fair notice of Dylan Davis's 42 U.S.C. § 1983 claims and resulting damages) to

the extent allowed by the Rehabilitation Act and the ADA, and Plaintiff also seek reasonable and necessary attorneys' fees and other remedies afforded by those laws.

IV.     Concluding Allegations and Prayer

      A.     Conditions Precedent

206.   All conditions precedent to assertion of all claims herein have occurred.

      B.     Use of Documents at Trial or Pretrial Proceedings

207.   Plaintiff intends to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

      C.     Jury Demand

208.   Plaintiff demands a jury trial on all issues which may be tried to a jury.

      D.     Prayer

209.   For these reasons, Plaintiff asks that Defendants be cited to appear and answer, and that Plaintiff (and Mr. Davis's heir at law, Dylan Davis) have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally applicable, for all damages referenced above in this pleading and:

      a)   actual damages of and for Dylan Davis, individually and as Mr. Davis's heir (asserted in Dylan Davis's capacity as administrator of the estate), including but not necessarily limited to:

      •   expenses for Mr. Davis's funeral;

      •   past mental anguish and emotional distress resulting from and caused by Mr. Davis's death;

- future mental anguish and emotional distress resulting from and caused by Mr. Davis's death;

- loss of companionship and society that he would have received from Mr. Davis; and

- Mr. Davis's conscious pain and suffering;

b)      actual damages of and for Peggy Herbert, including but not necessarily limited to:

- loss of services;

- past mental anguish and emotional distress resulting from and caused by Mr. Davis's death;

- future mental anguish and emotional distress resulting from and caused by Mr. Davis's death; and

- loss of companionship and society that he would have received from Mr. Davis;

c)      exemplary/punitive damages for Dylan Davis, individually and as the heir of Mr. Davis (asserted in Dylan Davis's capacity as administrator of the estate), and Peggy Hebert, from the natural person Defendants;

d)      reasonable and necessary attorneys' fees for Dylan Davis, individually and as the heir of Mr. Davis (asserted in Dylan Davis's capacity as administrator of the estate), and Peggy Hebert, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988, the ADA, and the Rehabilitation Act;

e)      court costs and all other recoverable costs;

f)      prejudgment and postjudgment interest at the highest allowable rates;  and

g)  all other relief, legal and equitable, general and special, to which Dylan

Davis, individually and as the heir of Mr. Davis (asserted in Dylan Davis's

capacity as administrator of the estate), and Peggy Hebert are entitled.

Respectfully submitted,

        /s/ T. Dean Malone
T. Dean Malone
Attorney-in-charge
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904
dean@deanmalone.com

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
Law Offices of Dean Malone, P.C.
900 Jackson Street
Suite 730
Dallas, Texas 75202
Telephone:     (214) 670-9989
Telefax:        (214) 670-9904
michael.oconnor@deanmalone.com